# EXHIBIT 17

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ONE MANHATTAN WEST

NEW YORK, NY 10001

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
212-735-3529
DIRECT FAX
917-777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

September 27, 2024

**VIA ELECTRONIC MAIL**

Heather Santo
Vice President
American Arbitration Association
SantoH@adr.org

Victoria Chandler
Director of ADR Services
American Arbitration Association
VictoriaChandler@adr.org

Krista Peach
Assistant Vice President
American Arbitration Association
peachk@adr.org

Jill Roettger
Manager of ADR Services
American Arbitration Association
jillroettger@adr.org

RE:    *Individual Claimants v. Valve Corporation*, Case No. 01-23-0004-3600

Dear Ms. Santo, Ms. Chandler, Ms. Peach, and Ms. Roettger:

We write on behalf of Respondent Valve Corporation ("Valve") to request that the AAA administratively close the above-referenced arbitration proceedings. The AAA no longer has jurisdiction over these cases because an AAA arbitrator ruled the arbitration agreement in Valve's Steam Subscriber Agreement ("SSA") under which these cases were brought is unenforceable, and Valve then removed the arbitration agreement from the SSA. The updated SSA provides:

> All disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

(*See* Ex. A § 10.)

In addition, counsel for the claimants in these matters, Bucher Law PLLC ("Claimants' Counsel"), filed a putative class action complaint on August 9, 2024, citing the previous AAA rulings on unenforceability and asserting that the arbitration agreement in the prior version of the SSA is unenforceable as to all members of a nationwide putative class, including all of the Claimants in these arbitrations, Complaint ¶ 14, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024).  As such, each Claimant's claims against Valve are still being pursued by their chosen counsel—just in a different forum (federal court), which Claimants' Counsel has stated is the superior forum for resolution.[1]

Accordingly, Valve respectfully requests that the AAA close these proceedings. Valve will reimburse Claimants' Counsel for all filing fees they have paid in these arbitrations, and will also pay all AAA fees incurred to date.

Respectfully,

/s/ *Michael W. McTigue Jr.*

Michael W. McTigue Jr.

cc:     Neil Currie, Vice President, American Arbitration Association
        All counsel of record

---

[1]    *See* Complaint ¶¶ 176–177, *Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024) (ECF No. 1) ("The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant . . .  This class action is superior to any other method for the fair and efficient adjudication of this legal dispute . . . [I]t is highly impracticable for such Class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.").

2

# Exhibit A

 **STEAM®**   **STORE**  COMMUNITY  ABOUT  SUPPORT

 Install Steam    login  |  language ▼

Valve has updated the Steam Subscriber Agreement. The updates affect your legal rights, including how disputes and claims between you and Valve are resolved. Among other things, the new dispute resolution provisions in Section 10 require that all disputes and claims proceed in court and not in arbitration. Please review carefully.

Home

# Steam Subscriber Agreement



## STEAM® SUBSCRIBER AGREEMENT

Table of contents:

1. Registration as a subscriber: application of terms to you; your account; conclusion of agreements
2. Licenses
3. Billing, payment and other subscriptions
4. Online conduct, cheating and illegal behavior
5. Third-party content
6. User generated content
7. Disclaimers; limitation of liability; no guarantees; limited warranty & agreement
8. Amendments to this agreement
9. Term and termination
10. Applicable law/jurisdiction
11. Miscellaneous

This Steam Subscriber Agreement ("Agreement") is a legal document that explains your rights and obligations as a subscriber of Steam from Valve Corporation, a corporation under the laws of the State of Washington, with its registered office at 10400 NE 4th St., Bellevue, WA 98004, United States, registered with the Washington Secretary of State under number 60 22 90 773, VAT ID No. EU 8260 00671 ("Valve"). Please read it carefully.

1. REGISTRATION AS A SUBSCRIBER; APPLICATION OF TERMS TO YOU; YOUR ACCOUNT, ACCEPTANCE OF AGREEMENTS ▲

Steam is an online service offered by Valve.

You become a subscriber of Steam ("Subscriber") by completing the registration of a Steam user account. This Agreement takes effect as soon as you indicate your acceptance of these terms. You may not become a Subscriber if you are under the age of 13. Steam is not intended for children under 13 and Valve will not knowingly collect personal information from children under the age of 13. Additional age restrictions may apply in your country.

A. Contracting Party

For any interaction with Steam your contractual relationship is with Valve. Except as otherwise indicated herein or at the time of the transaction (such as in the case of purchases from another Subscriber in a Subscription Marketplace), any transactions for Subscriptions (as defined below) you make on Steam are being made from Valve.

B. Hardware, Subscriptions; Content and Services

As a Subscriber you may obtain access to certain services, software and content available to Subscribers or purchase certain Hardware (as defined below) on Steam. The Steam client software and any other software, content, and updates you download or access via Steam, including but not limited to Valve or third-party video games and in-game content, software associated with Hardware and any virtual items you trade, sell or purchase in a Steam Subscription Marketplace are referred to in this Agreement as "Content and Services;" the rights to access and/or use any Content and Services accessible through Steam are referred to in this Agreement as "Subscriptions."

Each Subscription allows you to access particular Content and Services. Some Subscriptions may impose additional terms specific to that Subscription ("Subscription Terms") (for example, an end user license agreement specific to a particular game, or terms of use specific to a particular product or feature of Steam). Also, additional terms (for example, payment and billing procedures) may be posted on http://www.steampowered.com or within the Steam service ("Rules of Use"). Rules of Use include the Steam Online Conduct Rules http://steampowered.com/index.php?area=online_conduct and the Steam Refund Policy http://store.steampowered.com/steam_refunds. The Subscription Terms, the Rules of Use, and the Valve Privacy Policy (which can be found at http://www.valvesoftware.com/privacy.htm) are binding on you once you indicate your acceptance of them or of this Agreement, or otherwise become bound by them as described in Section 8 (Amendments to this Agreement).

C. Your Account

When you complete Steam's registration process, you create a Steam account ("Account"). Your Account may also include billing information you provide to Valve for transactions concerning Subscriptions, Content and Services and the purchase of any physical goods through Steam ("Hardware"). You may not reveal, share or otherwise allow others to use your password or Account except as

otherwise specifically authorized by Valve. You are responsible for the confidentiality of your login and password and for the security of your computer system. Valve is not responsible for the use of your password and Account or for all of the communication and activity on Steam that results from use of your login name and password by you, or by any person to whom you may have intentionally or by negligence disclosed your login and/or password in violation of this confidentiality provision. Unless it results from Valve's negligence or fault, Valve is not responsible for the use of your Account by a person who fraudulently used your login and password without your permission. If you believe that the confidentiality of your login and/or password may have been compromised, you must notify Valve via the support form (https://support.steampowered.com/newticket.php) without any delay.

Your Account, including any information pertaining to it (e.g.: contact information, billing information, Account history and Subscriptions, etc.), is strictly personal. You may therefore not sell or charge others for the right to use your Account, or otherwise transfer your Account, nor may you sell, charge others for the right to use, or transfer any Subscriptions other than if and as expressly permitted by this Agreement (including any Subscription Terms or Rules of Use) or as otherwise specifically permitted by Valve.

D. Acceptance of Agreements

Your order through Steam is an offer to Valve to agree on the delivery of the ordered Subscriptions, Content and Services and/or Hardware (the "Product(s)") in exchange for the listed price.

When you place an order on Steam, we will send you a message confirming receipt of your order and containing the details of your order (the "Order Confirmation"). The Order Confirmation is acknowledgement that we have received your order and does not confirm acceptance of your offer to enter into an agreement.

In the case of Content and Services, we accept your offer, and conclude the agreement with you, by confirming the transaction and making the Content and Services available to you or, in the case of pre-orders, only by confirming the transaction to you and deducting the applicable price from your payment method.

In the case of Hardware, we only accept your offer, and conclude the transaction for an item ordered by you, when we dispatch the Hardware to you and send e-mail confirming to you that we've dispatched the Hardware to you (the "Dispatch Confirmation"). If your order is dispatched in more than one package, you may receive a separate Dispatch Confirmation for each package, and each Dispatch Confirmation and corresponding dispatch will conclude a separate contract of sale between us for the Hardware specified in that Dispatch Confirmation. Any Hardware delivered to you remains property of Valve until payment has been fully made.

You consent to receiving sales invoices electronically.

E. Payment Processing

Payment processing related to Content and Services and/or Hardware purchased on Steam is performed by either Valve Corporation directly or by Valve's fully owned subsidiary Valve GmbH on behalf of Valve Corporation depending on the type of payment method used. If your card was issued outside the United States, your payment may be processed via a European acquirer by Valve GmbH on behalf of Valve Corporation. For any other type of purchases, payment will be collected by Valve Corporation directly. In any case, delivery of Content and Services as well as Hardware is performed by Valve Corporation.

2. LICENSES ▲

A. General Content and Services License

Steam and your Subscription(s) require the download and installation of Content and Services onto your computer. Valve hereby grants, and you accept, a non-exclusive license and right, to use the Content and Services for your personal, non-commercial use (except where commercial use is expressly allowed herein or in the applicable Subscription Terms). This license ends upon termination of (a) this Agreement or (b) a Subscription that includes the license. The Content and Services are licensed, not sold. Your license confers no title or ownership in the Content and Services. To make use of the Content and Services, you must have a Steam Account and you may be required to be running the Steam client and maintaining a connection to the Internet.

For reasons that include, without limitation, system security, stability, and multiplayer interoperability, Valve may need to automatically update, pre-load, create new versions of or otherwise enhance the Content and Services and accordingly, the system requirements to use the Content and Services may change over time.

You consent to such automatic updating. You understand that this Agreement (including applicable Subscription Terms) does not entitle you to future updates (unless to the extent required by applicable law), new versions or other enhancements of the Content and Services associated with a particular Subscription, although Valve may choose to provide such updates, etc. in its sole discretion.

B. Beta Software License

Valve may from time to time make software accessible to you via Steam prior to the general commercial release of such software ("Beta Software"). You are not required to use Beta Software, but if Valve offers it, you may elect to use it under the following terms. Beta Software will be deemed to consist of Content and Services, and each item of Beta Software provided will be deemed a Subscription for such Beta Software, with the following provisions specific to Beta Software:

- Your right to use the Beta Software may be limited in time, and may be subject to additional Subscription Terms;

- Valve or any Valve affiliate may request or require that you provide suggestions, feedback, or data regarding your use of the Beta Software, which will be deemed User Generated Content under Section 6 (User Generated Content) below; and

- In addition to the waivers and limitations of liability for all Software under Section 7 (Disclaimers; Limitations on Liability; No Guarantees; Limited Warranty & Agreement) below as applicable, you specifically acknowledge that Beta Software is only released for testing and improvement purposes, in particular to provide Valve with feedback on the quality and usability of the Beta Software, and therefore contains errors and is not final. If you decide to install and/or use Beta Software, you shall only use it in compliance with its purposes, i.e. for testing and improvement purposes, in compliance with system requirements specifically intended for each Beta Software and in any case not on a system or for purposes where the malfunction of the Beta Software can cause any kind of damage. In particular, maintain full backups of any system that you choose to install Beta Software on.

C. License to Use Valve Developer Tools

Your Subscription(s) may include access to various Valve tools that can be used to create content ("Developer Tools"). Some examples include: the Valve software development kit (the "SDK") for a version of the computer game engine known as "Source" (the "Source Engine") and the associated Valve Hammer editor, The Source® Filmmaker Software, or in-game tools through which you can edit or create derivative works of a Valve game. Particular Developer Tools (for example, The Source® Filmmaker Software) may be distributed with separate Subscription Terms that are different from the rules set forth in this Section. Except as set forth in any separate Subscription Terms applicable to the use of a particular Developer Tool, you may use the Developer Tools, and you may use, reproduce,

publish, perform, display and distribute any content you create using the Developer Tools, however you wish, but solely on a non-commercial basis.

If you would like to use the Source Engine SDK or other Valve Developer Tools for commercial use, please contact Valve at sourceengine@valvesoftware.com.

D. License to Use Valve Game Content in Fan Art.

Valve appreciates the community of Subscribers that creates fan art, fan fiction, and audio-visual works that reference Valve games ("Fan Art"). You may incorporate content from Valve games into your Fan Art. Except as otherwise set forth in this Section or in any Subscription Terms, you may use, reproduce, publish, perform, display and distribute Fan Art that incorporates content from Valve games however you wish, but solely on a non-commercial basis.

If you incorporate any third-party content in any Fan Art, you must be sure to obtain all necessary rights from the owner of that content.

Commercial use of some Valve game content is permitted via features such as Steam Workshop or a Steam Subscription Marketplace. Terms applicable to that use are set forth in Sections 3.D. and 6.B. below and in any Subscription Terms provided for those features.

To view the Valve video policy containing additional terms covering the use of audio-visual works incorporating Valve intellectual property or created with The Source® Filmmaker Software, please click here: http://www.valvesoftware.com/videopolicy.html

E. License to Use Valve Dedicated Server Software

Your Subscription(s) may contain access to the Valve Dedicated Server Software. If so, you may use the Valve Dedicated Server Software on an unlimited number of computers for the purpose of hosting online multiplayer games of Valve products. If you wish to operate the Valve Dedicated Server Software, you will be solely responsible for procuring any Internet access, bandwidth, or hardware for such activities and will bear all costs associated with your use.

F. Ownership of Content and Services

All title, ownership rights and intellectual property rights in and to the Content and Services and any and all copies thereof, are owned by Valve and/or its or its affiliates' licensors. All rights are reserved, except as expressly stated herein. The Content and Services are protected by copyright laws, international copyright treaties and conventions and other laws. The Content and Services contain certain licensed materials and Valve's and its affiliates' licensors may protect their rights in the event of any violation of this Agreement.

G. Restrictions on Use of Content and Services

You may not use the Content and Services for any purpose other than the permitted access to Steam and your Subscriptions, and to make personal, non-commercial use of your Subscriptions, except as otherwise permitted by this Agreement or applicable Subscription Terms. Except as otherwise permitted under this Agreement (including any Subscription Terms or Rules of Use), or under applicable law notwithstanding these restrictions, you may not, in whole or in part, copy, photocopy, reproduce, publish, distribute, translate, reverse engineer, derive source code from, modify, disassemble, decompile, create derivative works based on, or remove any proprietary notices or labels from the Content and Services or any software accessed via Steam without the prior consent, in writing, of Valve.

You are entitled to use the Content and Services for your own personal use, but you are not entitled to: (i) sell, grant a security interest in or transfer reproductions of the Content and Services to other parties in any way, nor to rent, lease or license the Content and Services to others without the prior written consent of Valve, except to the extent expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use); (ii) host or provide matchmaking services for the Content and Services or emulate or redirect the communication protocols used by Valve in any network feature of the Content and Services, through protocol emulation, tunneling, modifying or adding components to the Content and Services, use of a utility program or any other techniques now known or hereafter developed, for any purpose including, but not limited to network play over the Internet, network play utilizing commercial or non-commercial gaming networks or as part of content aggregation networks, websites or services, without the prior written consent of Valve; or (iii) exploit the Content and Services or any of its parts for any commercial purpose, except as expressly permitted elsewhere in this Agreement (including any Subscription Terms or Rules of Use).

3. BILLING, PAYMENT AND OTHER SUBSCRIPTIONS ▲

All charges incurred on Steam, and all purchases made with the Steam Wallet, are payable in advance and final, except as described in Sections 3.I and 7 below.

A. Payment Authorization

When you provide payment information to Valve or to one of its payment processors, you represent to Valve that you are the authorized user of the card, PIN, key or account associated with that payment, and you authorize Valve to charge your credit card or to process your payment with the chosen third-party payment processor for any Subscription, Steam Wallet funds, Hardware or other fees incurred by you.

For Subscriptions ordered based on an agreed usage period, where recurring payments are made in exchange for continued use ("Recurring Payment Subscriptions"), by continuing to use the Recurring Payment Subscription you agree and reaffirm that Valve is authorized to charge your credit card (or your Steam Wallet, if funded), or to process your payment with any other applicable third-party payment processor, for any applicable recurring payment amounts. If you have ordered any Recurring Payment Subscriptions, you agree to notify Valve promptly of any changes to your credit card account number, its expiration date and/or your billing address, or your PayPal or other payment account number, and you agree to notify Valve promptly if your credit card or PayPal or other payment account expires or is cancelled for any reason.

If your use of Steam or your purchase of Hardware on Steam is subject to any type of use or sales tax, then Valve may also charge you for those taxes, in addition to the Subscription or other fees published in the Rules of Use. All fees on Steam in the European Union and the United Kingdom include the EU or UK VAT ("VAT") tax. VAT amounts collected by Valve reflect VAT due on the value of any Content and Services, Hardware or Subscription.

You agree that you will not use IP proxying or other methods to disguise the place of your residence, whether to circumvent geographical restrictions on game content, to order or purchase at pricing not applicable to your geography, or for any other purpose. If you do this, Valve may terminate your access to your Account.

B. Responsibility for Charges Associated With Your Account

As the Account holder, you are responsible for all charges incurred, including applicable taxes, and all orders or purchases made by you or anyone that uses your Account, including your family or friends. If you cancel your Account, Valve reserves the right to collect fees, surcharges or costs incurred before cancellation. Any delinquent or unpaid Accounts must be settled before Valve will allow you to register again.

C. Steam Wallet

Steam may make available an account balance associated with your Account (the "Steam Wallet"). The Steam Wallet is neither a bank account nor any kind of payment instrument. It functions as a prepaid balance to order Content and Services. You may place funds in your Steam Wallet up to a maximum amount determined by Valve, by credit card, prepaid card, promotional code, or any other payment method accepted by Steam. Within any twenty-four (24) hour period, the total amount stored in your Steam Wallet plus the total amount spent out of your Steam Wallet, in the aggregate, may not exceed US$2,000 or its equivalent in your applicable local currency — attempted deposits into your Steam Wallet that exceed this threshold may not be credited to your Steam Wallet until your activity falls below this threshold. Valve may change or impose different Steam Wallet balance and usage limits from time to time.

You will be notified by e-mail of any change to the Steam Wallet balance and usage limits within sixty (60) calendar days before the entry into force of the change. Your continued use of your Steam Account more than thirty (30) calendar days after the entry into force of the changes will constitute your acceptance of the changes. If you don't agree to the changes, your only remedy is to terminate your Steam Account or to cease use of your Steam Wallet. Valve shall not have any obligation to refund any credits remaining on your Steam Wallet in this case.

You may use Steam Wallet funds to order Subscriptions, including by making in-game orders where Steam Wallet transactions are enabled, and purchase Hardware. Subject to Section 3.I, funds added to the Steam Wallet are non-refundable and non-transferable. Steam Wallet funds do not constitute a personal property right, have no value outside Steam and can only be used to order Subscriptions and related content via Steam (including but not limited to games and other applications offered through the Steam Store, or in a Steam Subscription Marketplace) and Hardware. Steam Wallet funds have no cash value and are not exchangeable for cash. Steam Wallet funds that are deemed unclaimed property may be turned over to the applicable authority.

D. Trading and Transactions of Subscriptions Between Subscribers

Steam may include one or more features or sites that allow Subscribers to trade, offer or order certain types of Subscriptions (for example, license rights to virtual items) with, to or from other Subscribers ("Subscription Marketplaces"). An example of a Subscription Marketplace is the Steam Community Market. By using or participating in Subscription Marketplaces, you authorize Valve, on its own behalf or as an agent or licensee of any third-party creator or publisher of the applicable Subscriptions in your Account, to transfer those Subscriptions from your Account in order to give effect to any trade or sale you make.

Valve may charge a fee for trades or sales in a Subscription Marketplace. Any fees will be disclosed to you prior to the completion of the trade or sale.

If you complete a trade, sale or order in a Subscription Marketplace, you acknowledge and agree that you are responsible for taxes, if any, which may be due with respect to your transactions, including sales or use taxes, and for compliance with applicable tax laws. Proceeds from sales you make in a Subscription Marketplace may be considered income to you for income tax purposes. You should consult with a tax specialist to determine your tax liability in connection with your activities in any Subscription Marketplace.

You understand and acknowledge that Valve does not have any obligation to provide or maintain any Subscription Marketplace. Valve may decide to cease operation of any Subscription Marketplace, change the fees that it charges or change the terms or features of the Steam Subscription Marketplace. You will be notified of any substantial change to the terms or availability of the Subscription Marketplace in a timely fashion before the entry into force of the change, except in cases of force majeure, Subscriber's fault or third party event outside of Valve's control.

You also understand and acknowledge that Subscriptions traded, sold or ordered in any Subscription Marketplace are license rights, that you have no ownership interest in such Subscriptions, and that Valve does not recognize any transfers of Subscriptions (including transfers by operation of law) that are made outside of Steam.

E. Retail Purchase

Valve may offer or require a Subscription for purchasers of retail packaged product versions or OEM versions of Valve products. The "CD-Key" or "Product Key" accompanying such versions is used to activate your Subscription. Further instructions will be provided along with the respective product.

F. Steam Authorized Resellers

You may order a Subscription through an authorized reseller of Valve. The "Product Key" accompanying such order will be used to activate your Subscription. Further instructions will be provided along with the respective product. If you order a Subscription from an authorized reseller of Valve, you agree to direct all questions regarding the Product Key to that reseller.

G. Free Subscriptions

In some cases, Valve may offer a free Subscription to certain Content and Services. As with all Subscriptions, you are always responsible for any Internet service provider, telephone, and other connection fees that you may incur when using Steam, even when Valve offers a free Subscription.

H. Third-Party Sites

Steam may provide links to other third-party sites. Some of these sites may charge separate fees, which are not included in and are in addition to any Subscription or other fees that you may pay to Valve. Steam may also provide access to third-party vendors, who provide content, goods and/or services on Steam or the Internet. Any separate charges or obligations you incur in your dealings with these third parties are your responsibility. Valve makes no representations or warranties, either express or implied, regarding any third party site. In particular, Valve makes no representation or warranty that any service or subscription offered via third-party vendors will not change or be suspended or terminated.

I. Refunds and Right of Withdrawal

Without prejudice to any statutory rights you may have, you can request a refund for your orders or purchases on Steam in accordance with the terms of Valve's Refund Policy http://store.steampowered.com/steam_refunds/.

For European Union and United Kingdom consumers:

EU and UK law provides a statutory right to withdraw from certain contracts for physical merchandise and for the order of digital content. You can find more information about the extent of your statutory right to withdraw and the ways you can exercise it on this page: https://support.steampowered.com/kb_article.php?ref=8620-QYAL-4516.

4. ONLINE CONDUCT, CHEATING AND PROCESS TAMPERING ▲

Your online conduct and interaction with other Subscribers must comply with the Steam Online Conduct Rules, to be found at http://steampowered.com/index.php?area=online_conduct. Depending on terms of use imposed by third parties who host particular games or other services, additional requirements may also be provided in the Subscription Terms applicable to a particular Subscription.

Steam and the Content and Services may include functionality designed to identify software or hardware processes or functionality that may give a player an unfair competitive advantage when playing multiplayer versions of any Content and Services or modifications of Content and Services ("Cheats"). You agree that you will not create Cheats or assist third parties in any way to create or use Cheats. You agree that you will not directly or indirectly disable, circumvent, or otherwise interfere with the operation of software designed to prevent or report the use of Cheats.

You agree that you will not tamper with the execution of Steam or Content and Services unless otherwise authorized by Valve. You acknowledge and agree that either Valve or any host of an online multiplayer game distributed through Steam ("External Host") may refuse to allow you to participate in certain online multiplayer games if you use Cheats or tamper with the execution of Steam or the Content and Services.

Further, you acknowledge and agree that External Hosts may report your use of Cheats or unauthorized process tampering to Valve, and Valve may communicate your history of use thereof to External Hosts within the boundaries of the Steam Privacy Policy.

Valve may restrict or terminate your Account or a particular Subscription for any conduct or activity that is illegal, constitutes a Cheat, or breaches the Steam Online Conduct Rules. You acknowledge that Valve is not required to provide you notice before terminating your Subscription(s) and/or Account.

You may not use Cheats, automation software (bots), mods, hacks, or any other unauthorized third-party software, to modify or automate any Subscription Marketplace process, the process of Steam account creation or otherwise in interacting with or controlling the processes or user interface of Steam, except to the degree expressly permitted.

## 5. THIRD-PARTY CONTENT ▲

In regard to all Subscriptions, Content and Services that are not authored by Valve, Valve does not screen such third-party content available on Steam or through other sources. Valve assumes no responsibility or liability for such third party content, unless to the extent provided by mandatory law. Some third-party application software is capable of being used by businesses for business purposes - however, you may only acquire such software via Steam for private personal use.

## 6. USER GENERATED CONTENT ▲

### A. General Provisions

Steam provides interfaces and tools for you to be able to generate content and make it available to other users and/or to Valve at your sole discretion. "User Generated Content" means any content you make available to other users through your use of multi-user features of Steam, or to Valve or its affiliates through your use of the Content and Services or otherwise.

When you upload your content to Steam to make it available to other users and/or to Valve, you grant Valve and its affiliates the worldwide, non-exclusive right to use, reproduce, modify, create derivative works from, distribute, transmit, transcode, translate, broadcast, and otherwise communicate, and publicly display and publicly perform, your User Generated Content, and derivative works of your User Generated Content, for the purpose of the operation, distribution, incorporation as part of and promotion of the Steam service, Steam games or other Steam offerings, including Subscriptions. This license is granted to Valve as the content is uploaded on Steam for the entire duration of the intellectual property rights. It may be terminated if Valve is in breach of the license and has not cured such breach within fourteen (14) days from receiving notice from you sent to the attention of the Valve Legal Department at the applicable Valve address noted on this **Privacy Policy** page. The termination of said license does not affect the rights of any sub-licensees pursuant to any sub-license granted by Valve prior to termination of the license. Valve is the sole owner of the derivative works created by Valve from your User Generated Content, and is therefore entitled to grant licenses on these derivative works. If you use Valve cloud storage, you grant us a license to store your information as part of that service. Valve may place limits on the amount of storage you may use.

If you provide Valve with any feedback or suggestions about Steam, the Content and Services, or any Valve products, Hardware or services, Valve is free to use the feedback or suggestions however it chooses, without any obligation to account to you.

You agree that the User Generated Content you upload on Steam through the interfaces and tools provided by Valve is given significant exposure and that you share it for your enjoyment and for the recognition you may receive from other Subscribers. Consequently, you grant this license to Valve and its affiliates for free, notwithstanding any other contrary terms provided in App-Specific Terms, as defined under Section 6.B below.

### B. Content Uploaded to the Steam Workshop

Some games or applications available on Steam ("Workshop-Enabled Apps") allow you to create User Generated Content based on or using the Workshop-Enabled App, and to submit that User Generated Content (a "Workshop Contribution") to one or more Steam Workshop web pages. Workshop Contributions can be viewed by the Steam community, and for some categories of Workshop Contributions users may be able to interact with, download or purchase the Workshop Contribution. In some cases, Workshop Contributions may be considered for incorporation by Valve or a third-party developer into a game or into a Subscription Marketplace.

You understand and agree that Valve is not obligated to use, distribute, or continue to distribute copies of any Workshop Contribution and reserves the right, but not the obligation, to restrict or remove Workshop Contributions for any reason.

Specific Workshop-Enabled Apps or Workshop web pages may contain special terms ("App-Specific Terms") that supplement or change the terms set out in this Section to reflect the individual requirements of the Workshop-Enabled App in question.

Under Section 6.A, Workshop Contributions are in principle made available to Subscribers for free. By way of exception, they may be made available to Subscribers for a fee. In that case, the way the revenues generated may be shared, and in particular, the compensation you may receive as a result of this making available, are defined in the App-Specific Terms and not by this Agreement. Unless otherwise specified in App-Specific Terms (if any), the following general rules apply to Workshop Contributions.

- Workshop Contributions are Subscriptions, and therefore you agree that any Subscriber receiving distribution of your Workshop Contribution will have the same rights to use your Workshop Contribution (and will be subject to the same restrictions) as are set out in this Agreement for any other Subscriptions.

- Notwithstanding the license described in Section 6.A, Valve will only have the right to modify including to create derivative works from your Workshop Contribution in the following cases: (a) Valve may make modifications necessary to make your Contribution compatible with Steam and the Workshop functionality or user interface, and (b) Valve or the applicable developer may make modifications to Workshop Contributions that are accepted for in-Application distribution as it deems necessary or desirable to

enhance gameplay or make it compatible with the Workshop-Enabled App. Under Section 6.A, you grant for free to Valve and its affiliates the right to modify, including to create derivative works from, your Workshop Contribution. As a result, you are not entitled to any compensation from Valve as a result of Valve's modifications.

- You may, in your sole discretion, choose to remove a Workshop Contribution from the applicable Workshop pages. If you do so, Valve will no longer have the right to use, distribute, transmit, communicate, publicly display or publicly perform the Workshop Contribution, except that (a) Valve may continue to exercise these rights for any Workshop Contribution that is accepted for distribution in-game or distributed in a manner that allows it to be used in-game, and (b) your removal will not affect the rights of any Subscriber who has already obtained access to a copy of the Workshop Contribution.

### C. Promotions and Endorsements

If you use Steam services (e.g. the Steam Curators' Lists or the Steam Broadcasting service) to promote or endorse a product, service or event in return for any kind of consideration from a third party (including non-monetary rewards such as free games), you must clearly indicate the source of such consideration to your audience.

### D. Representations and Warranties

You represent and warrant to us that you have sufficient rights in all User Generated Content to grant Valve and other affected parties the licenses described under A. and B. above or in any license terms specific to the applicable Workshop-Enabled App or Workshop page. This includes, without limitation, any kind of intellectual property rights or other proprietary or personal rights affected by or included in the User Generated Content. In particular, with respect to Workshop Contributions, you represent and warrant that the Workshop Contribution was originally created by you (or, with respect to a Workshop Contribution to which others contributed besides you, by you and the other contributors, and in such case that you have the right to submit such Workshop Contribution on behalf of those other contributors).

You furthermore represent and warrant that the User Generated Content, your submission of that Content, and your granting of rights in that Content does not violate any applicable contract, law or regulation.

### 7. DISCLAIMERS; LIMITATION OF LIABILITY; NO GUARANTEES; LIMITED WARRANTY & AGREEMENT ▲

THIS SECTION 7 DOES NOT APPLY TO EU OR UK SUBSCRIBERS.

- FOR AUSTRALIAN SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY GUARANTEE, RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED, INCLUDING THOSE CONFERRED BY THE AUSTRALIAN CONSUMER LAW (ACL). UNDER THE ACL, GOODS COME WITH GUARANTEES INCLUDING A GUARANTEE THAT GOODS ARE OF ACCEPTABLE QUALITY. IF THERE IS A FAILURE OF THIS GUARANTEE, YOU ARE ENTITLED TO A REMEDY (WHICH MAY INCLUDE HAVING THE GOODS REPAIRED OR REPLACED OR A REFUND). IF A REPAIR OR REPLACEMENT CANNOT BE PROVIDED OR THERE IS A MAJOR FAILURE, YOU ARE ENTITLED TO A REFUND.

- FOR NEW ZEALAND SUBSCRIBERS, THIS SECTION 7 DOES NOT EXCLUDE, RESTRICT OR MODIFY THE APPLICATION OF ANY RIGHT OR REMEDY THAT CANNOT BE SO EXCLUDED, RESTRICTED OR MODIFIED INCLUDING THOSE CONFERRED BY THE NEW ZEALAND CONSUMER GUARANTEES ACT 1993. UNDER THIS ACT ARE GUARANTEES WHICH INCLUDE THAT GOODS AND SERVICES ARE OF ACCEPTABLE QUALITY. IF THIS GUARANTEE IS NOT MET THERE ARE ENTITLEMENTS TO HAVE THE SOFTWARE REMEDIED (WHICH MAY INCLUDE REPAIR, REPLACEMENT OR REFUND). IF A REMEDY CANNOT BE PROVIDED OR THE FAILURE IS OF A SUBSTANTIAL CHARACTER, THE ACT PROVIDES FOR A REFUND.

Prior to acquiring a Subscription, you should consult the product information made available on Steam, including Subscription description, minimum technical requirements, and user reviews.

### A. DISCLAIMERS

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, VALVE AND ITS AFFILIATES AND SERVICE PROVIDERS EXPRESSLY DISCLAIM (I) ANY WARRANTY FOR STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, AND (II) ANY COMMON LAW DUTIES WITH REGARD TO STEAM, THE CONTENT AND SERVICES, AND THE SUBSCRIPTIONS, INCLUDING DUTIES OF LACK OF NEGLIGENCE AND LACK OF WORKMANLIKE EFFORT. STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH ARE PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS, "WITH ALL FAULTS" AND WITHOUT WARRANTY OF ANY KIND, EITHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, OR NONINFRINGEMENT. ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE AND/OR IN ANY OTHER COMPARABLE STATE STATUTE IS EXPRESSLY DISCLAIMED. ALSO, THERE IS NO WARRANTY OF TITLE, NON-INTERFERENCE WITH YOUR ENJOYMENT, OR AUTHORITY IN CONNECTION WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, OR INFORMATION AVAILABLE IN CONNECTION THEREWITH.

ANY WARRANTY AGAINST INFRINGEMENT THAT MAY BE PROVIDED IN SECTION 2-312 OF THE UNITED STATES UNIFORM COMMERCIAL CODE IS EXPRESSLY DISCLAIMED.

### B. LIMITATION OF LIABILITY

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE, ITS LICENSORS, NOR THEIR AFFILIATES, NOR ANY OF VALVE'S SERVICE PROVIDERS, SHALL BE LIABLE IN ANY WAY FOR LOSS OR DAMAGE OF ANY KIND RESULTING FROM THE USE OR INABILITY TO USE STEAM, YOUR ACCOUNT, YOUR SUBSCRIPTIONS AND THE CONTENT AND SERVICES INCLUDING, BUT NOT LIMITED TO, LOSS OF GOODWILL, WORK STOPPAGE, COMPUTER FAILURE OR MALFUNCTION, OR ANY AND ALL OTHER COMMERCIAL DAMAGES OR LOSSES. IN NO EVENT WILL VALVE BE LIABLE FOR ANY INDIRECT, INCIDENTAL, CONSEQUENTIAL, SPECIAL, PUNITIVE OR EXEMPLARY DAMAGES, OR ANY OTHER DAMAGES ARISING OUT OF OR IN ANY WAY CONNECTED WITH STEAM, THE CONTENT AND SERVICES, THE SUBSCRIPTIONS, AND ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH, OR THE DELAY OR INABILITY TO USE THE CONTENT AND SERVICES, SUBSCRIPTIONS OR ANY INFORMATION, EVEN IN THE EVENT OF VALVE'S OR ITS AFFILIATES' FAULT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, OR BREACH OF VALVE'S WARRANTY AND EVEN IF IT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THESE LIMITATIONS AND LIABILITY EXCLUSIONS APPLY EVEN IF ANY REMEDY FAILS TO PROVIDE ADEQUATE RECOMPENSE.

BECAUSE SOME STATES OR JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR THE LIMITATION OF LIABILITY FOR CONSEQUENTIAL OR INCIDENTAL DAMAGES, IN SUCH STATES OR JURISDICTIONS, EACH OF VALVE, ITS LICENSORS, AND ITS AFFILIATES' LIABILITY SHALL BE LIMITED TO THE FULL EXTENT PERMITTED BY LAW.

## C. NO GUARANTEES

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, NEITHER VALVE NOR ITS AFFILIATES GUARANTEE CONTINUOUS, ERROR-FREE, VIRUS-FREE OR SECURE OPERATION AND ACCESS TO STEAM, THE CONTENT AND SERVICES, YOUR ACCOUNT AND/OR YOUR SUBSCRIPTION(S) OR ANY INFORMATION AVAILABLE IN CONNECTION THEREWITH.

## D. LIMITED WARRANTY & AGREEMENT

CERTAIN HARDWARE PURCHASED FROM VALVE IS SUBJECT TO A LIMITED WARRANTY & AGREEMENT, [OR DEPENDING ON YOUR LOCATION, A STATUTORY WARRANTY] WHICH IS DESCRIBED IN DETAIL HERE.

## 8. AMENDMENTS TO THIS AGREEMENT ▲

PLEASE NOTE: If you are a consumer with place of residence in Germany, a different version of Section 8 applies to you, which is available here.

### A. Mutual Amendment

This Agreement may at any time be mutually amended by your explicit consent to changes proposed by Valve.

### B. Unilateral Amendment

Furthermore, Valve may amend this Agreement (including any Subscription Terms or Rules of Use) unilaterally at any time in its sole discretion. In this case, you will be notified by e-mail of any amendment to this Agreement made by Valve at least 30 (30) days before the effective date of the amendment. You can view the Agreement at any time at http://www.steampowered.com/. Your failure to cancel your Account prior to the effective date of the amendment will constitute your acceptance of the amended terms. If you don't agree to the amendments or to any of the terms in this Agreement, your only remedy is to cancel your Account or to cease use of the affected Subscription(s). Valve shall not have any obligation to refund any fees that may have accrued to your Account before cancellation of your Account or cessation of use of any Subscription, nor shall Valve have any obligation to prorate any fees in such circumstances.

## 9. TERM AND TERMINATION ▲

### A. Term

The term of this Agreement (the "Term") commences on the date you first indicate your acceptance of these terms, and will continue in effect until otherwise terminated in accordance with this Agreement.

### B. Termination by You

You may cancel your Account at any time. You may cease use of a Subscription at any time or, if you choose, you may request that Valve terminate your access to a Subscription. However, Subscriptions are not transferable, and even if your access to a Subscription for a particular game or application is terminated, the original activation key will not be able to be registered to any other account, even if the Subscription was obtained in a retail store. Access to Subscriptions ordered as a part of a pack or bundle cannot be terminated individually, termination of access to one game within the bundle will result in termination of access to all games ordered in the pack. Your cancellation of an Account, or your cessation of use of any Subscription or request that access to a Subscription be terminated, will not entitle you to any refund, including of any Subscription fees. Valve reserves the right to collect fees, surcharges or costs incurred prior to the cancellation of your Account or termination of your access to a particular Subscription. In addition, you are responsible for any charges incurred to third-party vendors or content providers before your cancellation.

### C. Termination by Valve

Valve may restrict or cancel your Account or any particular Subscription(s) at any time in the event that (a) Valve ceases providing such Subscriptions to similarly situated Subscribers generally, or (b) you breach any terms of this Agreement (including any Subscription Terms or Rules of Use). In the event that your Account or a particular Subscription is restricted or terminated or cancelled by Valve for a violation of this Agreement or improper or illegal activity, no refund, including of any Subscription fees or of any unused funds in your Steam Wallet, will be granted.

### D. Survival of Terms

Sections 2.C., 2.D., 2.F., 2.G., 3.A., 3.B., 3.D., 3.H., and 5 - 11 will survive any expiration or termination of this Agreement.

## 10. APPLICABLE LAW/JURISDICTION ▲

Most user concerns can be resolved by use of our Steam support site at https://support.steampowered.com/. If Valve is unable to resolve your concerns and a dispute remains between you and Valve, this Section explains how the parties have agreed to resolve it.

For All Subscribers Outside the European Union and United Kingdom:

You and Valve agree that this Agreement shall be deemed to have been made and executed in the State of Washington, U.S.A., and Washington law, excluding conflict of laws principles and the Convention on Contracts for the International Sale of Goods, governs all disputes and claims arising out of or relating to: (i) any aspect of the relationship between us; (ii) this Agreement; or (iii) your use of Steam, your Account or the Content and Services. You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

If the laws where you live mandate alternative dispute resolution options, you may seek a remedy under those options. If you are a consumer who lives in Russia, you may also seek a remedy with local Russian state courts.

For EU and UK Subscribers:

This Agreement is governed by the law of the country where you have your habitual residence.

In the event of a dispute relating to the interpretation, the performance or the validity of the Subscriber Agreement, an amicable solution may be sought before any legal action. You can file your complaint at http://help.steampowered.com. The European Commission provides an Online Dispute Resolution website for EU consumers at https://ec.europa.eu/consumers/odr. Participation in this website is not available to US companies, which is why Valve is not registered there. However, insofar as your complaint concerns the behavior of Valve's data protection representative Valve GmbH you can file your complaint there.

In the event that an Alternative Dispute Resolution Procedure fails, or if either Valve or you prefer not to resort to Alternative Dispute Resolution, you may bring proceedings in the courts of the place where you are domiciled.

## 11. MISCELLANEOUS ▴

In the event that any provision of this Agreement is held by a court to be invalid or unenforceable, such provision will be deemed severable and the remaining provisions of this Agreement shall remain in full force and effect.

This Agreement, including any Subscription Terms, Rules of Use, the Valve Privacy Policy, and the Valve Hardware Limited Warranty Policy, constitutes and contains the entire agreement between the parties with respect to the subject matter hereof and supersedes any prior oral or written agreements. You agree that this Agreement is not intended to confer and does not confer any rights or remedies upon any person other than the parties to this Agreement.

Valve's obligations are subject to existing laws and legal process and Valve may comply with law enforcement or regulatory requests or requirements notwithstanding any contrary term.

You agree to comply with all applicable import/export laws and regulations. You agree not to export the Content and Services or Hardware or allow use of your Account by individuals of any terrorist supporting countries to which encryption exports are at the time of exportation restricted by the U.S. Bureau of Export Administration. You represent and warrant that you are not located in, under the control of, or a national or resident of any such prohibited country.

This Agreement was last updated on September 26, 2024 ("Revision Date"). If you were a Subscriber before the Revision Date, it replaces and supersedes your existing agreement with Valve or Valve SARL on the day that it becomes effective according to Section 8 above.

Privacy Feedback

**VALVE**™   © 2024 Valve Corporation. All rights reserved. All trademarks are property of their respective owners in the US and other countries. VAT included in all prices where applicable.  Privacy Policy  |  Legal  |  Steam Subscriber Agreement  |  Refunds  |  Cookies

About Valve  |  Jobs  |  Steamworks  |  Steam Distribution  |  Support  |  Recycling  |  Gift Cards  |  **f** Steam  |  𝕏 @steam

# EXHIBIT 18

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

### ONE MANHATTAN WEST
### NEW YORK, NY 10001

——

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

FIRM/AFFILIATE OFFICES

----------

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
PALO ALTO
WASHINGTON, D.C.
WILMINGTON

----------

BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MUNICH
PARIS
SÃO PAULO
SEOUL
SHANGHAI
SINGAPORE
TOKYO
TORONTO

DIRECT DIAL
212-735-3529
DIRECT FAX
917-777-3529
EMAIL ADDRESS
MICHAEL.MCTIGUE@SKADDEN.COM

September 27, 2024

**VIA ELECTRONIC MAIL**

William Bucher
Bucher Law PLLC
350 Northern Boulevard
Suites 324-1519
Albany, NY 12204-1000
will@bucherlawfirm.com

RE:    *Individual Claimants v. Valve Corporation*, Case No. 01-23-0004-3600

Dear Mr. Bucher:

As you are aware, Valve has requested that the AAA administratively close these arbitrations for lack of jurisdiction because an AAA arbitrator ruled the arbitration agreement in Valve's Steam Subscriber Agreement ("SSA") was unenforceable and Valve then removed the arbitration agreement from the SSA. The updated SSA provides:

> All disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained exclusively in any state or federal court located in King County, Washington, having subject matter jurisdiction. You and Valve hereby consent to the exclusive jurisdiction of such courts and waive any objections as to personal jurisdiction or venue in such courts.

(*See* SSA § 10.)

In addition, Valve sent you a letter on September 24, 2024, noting you had (i) successfully challenged the enforceability of the arbitration agreement in the prior version of the SSA ("Superseded SSA") and (ii) filed a putative class action complaint on August 9, 2024, asserting that the arbitration agreement in the Superseded SSA is unenforceable as to all members of a nationwide putative class, including all of the claimants in these arbitrations, Complaint ¶ 14,

*Elliott v. Valve Corporation*, No. 2:24-cv-01218 (W.D. Wash. filed Aug. 9, 2024). Our letter further explained that you are seeking to represent the putative class members, including these claimants, in litigation on the same claims; you are still pursuing your clients' interests, just in a different forum.

Valve stated that it agreed with you that the arbitration agreement in the Superseded SSA has been held to be, and is unenforceable, and therefore asked whether you agree that these arbitrations should accordingly be closed. Valve also asked for wiring instructions so it could reimburse the filing fees paid by claimants. You did not respond to Valve's letter. In any event, the removal of the arbitration agreement further requires that these arbitrations be closed.

Please send us a copy of the applicable AAA filing fee invoices you have paid together with payment instructions and any necessary completed W-9 form(s) so that we may promptly arrange reimbursement.

Sincerely,

/s/ *Michael W. McTigue Jr.*

Michael W. McTigue Jr.

# EXHIBIT 19

AAA ARBITRATION


DANIEL GUADARRAMA, ET AL.,            )
                                     )
          Claimants,                 )
                                     )
    vs.                              ) Case No.
                                     ) 01-23-0005-3031
VALVE CORPORATION d/b/a STEAM,       )
                                     )
          Respondents.               )
_____)



       HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

              VOLUME I (Pages 1 - 294)

             TRANSCRIPT OF PROCEEDINGS

             LOS ANGELES, CALIFORNIA

             MONDAY, OCTOBER 20, 2025

                   9:04 A.M.







FILE NO. J13595033
REPORTED BY LEESA DURRANT, CSR NO. 11899, RPR


THE SULLIVAN GROUP
OF COURT REPORTERS
AN ESQUIRE DEPOSITION SOLUTIONS COMPANY

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY TRANSCRIPT

Q    So it's fair to say that you have not logged into Steam for almost a year?

A    Right.

Q    Okay.  All right.

So we're going to come back to this document throughout my questioning, but for right now I'd like you to turn to tab two.  Tab two of the binder is a document that has been premarked as Respondents' Exhibit R5293, and at the top it is labeled "Affidavit of Daniel Guadarrama."

Do you see that?

A    Yes.

Q    Do you recognize this document?

A    Yes.

Q    And what is it?

A    It's the -- I guess it's the -- basically the declaration that I retained Bucher law representing me.

MS. NOTEWARE:  I'm just going to caution the witness not to talk about anything that you've discussed with your lawyers.  I don't think you're asking for that, but yeah.

MR. HOROWITZ:  Thank you.

BY MR. HOROWITZ:

Q    Okay.  Is that your signature at the bottom of the document?

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY TRANSCRIPT

BY MR. HOROWITZ:

Q    Okay.  We can just -- I'll just go through it quickly here.

So in the middle of the document there's a sentence that says, "My Steam account has at least 100 games associated with it."

Do you see that?

A    Yes.

Q    So what did you do to confirm the accuracy of that specific statement?

A    I had already looked at my Steam account one more time before I logged out to get an idea of how many games I had.  I think I counted over 200.  And I had saved the -- the web page, I think, ID, I think, from my Steam account page.  There's like an ID at the end.  I think that's what it was.  So I was able to copy the ID without logging into Steam.

Q    So you wrote "at least a hundred games"; right?

A    Yes.

Q    Would it surprise you if, in fact, you've actually purchased over 500 games on Steam?

MS. NOTEWARE:  Objection to -- objection.  I don't think that's accurate.

ARBITRATOR OHASHI:  Overruled.

game?

    A    Right.

    Q    Okay.  Do you own No Man's Sky?

    A    Yes.

    Q    Can you still play No Man's Sky?

    A    Not right now.

    Q    Why is that?

    A    Because I'd have to log into Steam to play it. But if I log into Steam, then it's like I accept the new terms and then I have to drop the lawsuit and everything.  Sorry.

    Q    So at some point, a year or so ago, you saw a notice from Steam that said their terms changed; is that what you're saying?

    A    Yes.

    Q    Your understanding of the terms change, you couldn't pursue this action?

    A    Right.

    Q    You wanted to pursue this action still?

    A    Yes.

    Q    Okay.

    MS. NOTEWARE:  That's all the questions that I have.

    ARBITRATOR OHASHI:  Okay.  Mr. Horowitz.

    MR. HOROWITZ:  Nothing further from me.

# EXHIBIT 20

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JOHN ELLIOTT, RICARDO CAMARGO, JAVIER ROVIRA, and BRADLY SMITH,<br><br>Plaintiffs,<br><br>v.<br><br>VALVE CORPORATION,<br><br>Defendant. | Case No. 2:24-cv-01218<br><br>**CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT - 1
Case No. 2:24-cv-01218

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE   (206) 623-0594 FAX

011258-11/2686081 V1

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| I. | OVERVIEW OF THE ACTION | 1 |
| II. | PARTIES | 6 |
|  | A. Plaintiffs | 6 |
|  | B. Defendant | 7 |
| III. | JURISDICTION AND VENUE | 7 |
| IV. | JUSTICIABILITY | 8 |
| V. | BACKGROUND | 9 |
|  | A. Valve transforms itself from a PC game publisher to a platform monopolist | 9 |
|  | B. Having entrenched itself as the gateway to PC games, Valve extracts supra-competitive prices from sales on Steam. | 10 |
| VI. | RELEVANT MARKETS | 11 |
|  | A. Both relevant product markets are limited to PC games | 12 |
|  | B. First Relevant Product Market – PC Game Distribution | 14 |
|  | C. Second Relevant Product Market – PC In-Game Payment Processing | 16 |
|  | D. Geographic Market | 18 |
| VII. | VALVE POSSESSES MONOPOLY POWER IN THE RELEVANT MARKETS | 18 |
|  | A. Valve dominates the PC Game Distribution Market and the PC In-Game Payment Processing Market. | 18 |
|  | B. Barriers to entry are high. | 20 |
|  | C. Valve's supracompetitive prices and ability to restrict output provide direct proof of its monopoly power. | 21 |
| VIII. | STEAM HAS UNLAWFULLY MONOPOLIZED THE RELEVANT MARKETS | 22 |
|  | A. Valve's PMFN restricts price competition. | 22 |

CLASS ACTION COMPLAINT - i
Case No. 2:24-cv-01218

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

011258-11/2686081 V1

B. Valve restricts competition by tying PC In-Game Payment Processing to PC Game Distribution. ...............................................................27

C. Valve's PMFN and tying conduct have severe anticompetitive effects. ......................................................................................................28

   1. Valve's PMFN suppresses competition and causes consumers to pay higher prices. ............................................................28

   2. Valve's tying conduct impedes competition and causes consumers to pay higher prices. ............................................................32

IX. VALVE'S ANTICOMPETITIVE RESTRAINTS HAVE PREVENTED RIVAL PLATFORMS FROM SEIZING SIGNIFICANT MARKET SHARE. ......................................................................................................32

A. Discord ...........................................................................................33

B. Microsoft, Amazon, Google ...........................................................34

C. Epic Games Store ............................................................................35

X. VALVE'S ANTICOMPETITIVE PRACTICES DIRECTLY HARM CONSUMERS ............................................................................................37

A. Valve uses Steam Keys to protect its monopoly and overcharge consumers. ......................................................................................40

B. Valve advises publishers not to engage in price competition and facilitates price coordination. ...........................................................42

XI. CLASS ACTION ALLEGATIONS ...........................................................44

XII. INTERSTATE TRADE AND COMMERCE ..............................................46

XIII. FRAUDULENT CONCEALMENT ...........................................................46

XIV. CAUSES OF ACTION ..............................................................................47

FIRST CAUSE OF ACTION  SHERMAN ACT SECTION 2— MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2) ...............................................................................................47

SECOND CAUSE OF ACTION  SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2) ...............................................................................................48

THIRD CAUSE OF ACTION ................................................................................49

CLASS ACTION COMPLAINT - ii
Case No. 2:24-cv-01218

011258-11/2686081 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC IN-GAME
    PAYMENT PROCESSING MARKET (15 U.S.C. § 2) .................................................49

FOURTH CAUSE OF ACTION  SHERMAN ACT SECTION 2—ATTEMPTED
    MONOPOLIZATION OF THE PC IN-GAME PAYMENT
    PROCESSING MARKET (15 U.S.C. § 2).....................................................................50

FIFTH CAUSE OF ACTION  SHERMAN ACT SECTION 1—
    UNREASONABLE RESTRAINTS ON TRADE THROUGH
    PUBLISHERS (15 U.S.C. § 1) .....................................................................................51

SIXTH CAUSE OF ACTION  SHERMAN ACT SECTION 1—
    UNREASONABLE RESTRAINTS ON TRADE BY TYING CONDUCT
    (15 U.S.C. § 1) ..........................................................................................................52

SEVENTH CAUSE OF ACTION  WASHINGTON STATE CONSUMER
    PROTECTION ACT, RCW 19.86.................................................................................54

EIGHTH CAUSE OF ACTION  CALIFORNIA UNFAIR COMPETITION LAW
    ("UCL"), CAL. BUS. & PROF. CODE SECTION 17200 ET SEQ. .............................54

PRAYER FOR RELIEF ........................................................................................................55

JURY DEMAND...................................................................................................................56

CLASS ACTION COMPLAINT - iii
Case No. 2:24-cv-01218

011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Plaintiffs John Elliott, Ricardo Camargo, Javier Rovira, and Bradly Smith ("Plaintiffs") bring this action against Valve Corporation under federal and state antitrust laws and state unfair competition laws, seeking public injunctive relief and damages, and allege as follows:

### I.      OVERVIEW OF THE ACTION

1.      Defendant Valve Corporation sells Personal Computer ("PC") games through its online store, the Steam Store.  Valve launched Steam in the early 2000s to distribute its own games, but soon recognized an opportunity to generate additional revenue by distributing games developed and marketed by third-party game publishers.  Soon after its launch in 2005, the Steam Store achieved market dominance, which it has maintained and enhanced ever since. Today, PC games generate billions annually, and Valve takes a staggering 75% of the bounty.

2.      Valve generates its revenues primarily through a 30% tax it imposes on game publishers[1] and, in the end, game consumers.  If a publisher sells a game on Steam for $30, Valve takes a whopping $9 of the proceeds, which is almost pure profit to Valve given the low marginal costs of operating an online game store.  Similarly, Valve takes the same 30% cut for payment processing whenever a publisher sells in-game products (e.g., game enhancements sold during gameplay), even though most payment processors would charge fees of 4% or less for these payment processing services.  In the words of one former Valve employee, these high fees have made Valve a "virtual printing press," one that imposes a "30% tax on an entire industry."[2]

3.      While Valve imposes its 30% tax on game publishers, the overcharge is ultimately born by consumers in the form of inflated prices for games and in-game products. This is because Valve's fees, like any other cost of doing business, are built into the prices publishers charge consumers for games and in-game products.  Plaintiffs in this case are consumers who paid those supracompetitive prices and were directly injured as a result.

---

[1] In the PC gaming environment, a game "publisher" is generally understood to be the entity that markets a game.  The publisher may also be the creator or "developer" of the game, but need not be.

[2] APramath, *Former Valve Employee Says Steam Was Killing PC Gaming, Epic Games Is Saving It*, GAMINGBOLT (Apr. 8, 2019), https://gamingbolt.com/steam-was-killing-pc-gaming-epic-games-store-is-saving-it-former-valve-employee.

CLASS ACTION COMPLAINT - 1
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

4.      Valve is able to charge exorbitant fees and maintain market dominance not because it built a superior PC games store.  Far from it, Valve maintains market dominance by strangling competition with nakedly anticompetitive pricing restraints.  These pricing restraints are embodied in what economists call a platform most-favored-nations clause (the "PMFN").  Valve's PMFN prevents any publisher that sells a game on Steam from either (a) selling that game on a rival platform for a lower price (price parity), or (b) providing additional game content or enhancements on a rival platform (content parity).  As explained by the founder and CEO of Epic Games ("Epic"), a putative competitor of Valve, "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then . . . Valve can simply say 'no.'"[3]

5.      To understand how Valve's PMFN impedes competition, it is important to first envision how competition would unfold in a well-functioning market for PC games and in-game products.  In a functioning market, game publishers could (and would) vary the pricing of their games and in-game products to reflect variance in the platform fees charged by game stores and payment processors serving the market.  This is normal retail pricing behavior across industries.  For example, if a game store charged 12% instead of Valve's 30% (and as discussed below, some do), without Valve's PMFN game publishers would be incentivized to *lower* their prices on that rival platform, both to reflect the platform's lower costs and also to drive consumers to this more cost-effective (and thus profit-maximizing) distribution channel.  So, instead of charging a flat $30 wherever a game is sold, absent the PMFN, a publisher could charge $30 on Steam, and $25 on a rival platform charging a lower 12% commission, which represents almost 17% in savings to consumers.

---

[3] Tim Sweeney (@TimSweeneyEpic), TWITTER (Jan. 30, 2019, 9:29 AM), https://twitter.com/timsweeneyepic/status/1090663312814157824?lang=en.

CLASS ACTION COMPLAINT - 2
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

|  | STEAM | RIVAL PLATFORM |
|---|---|---|
| **Platform Fee** | 30% | 12% |
| **Price to Consumer** | $30.00 | $25.00 |
| **Developer Net Revenue (Price to Consumer – Platform Fee)** | $21.00 | $22.00 |

6. This type of normal differential pricing, which is seen in any competitive market, would incentivize rival platforms to compete more aggressively with Valve on platform fees. That is, to win business, platforms would maintain lower platform fees to incentivize publishers to discount prices on their platforms to attract consumers. Facing this threat of lost volume, Valve would be incentivized to lower its fees to compete, driving prices down across the market.

7. And again, consumers would be the ultimate beneficiaries of this normal price competition. Absent Valve's PMFN, consumers would benefit, first, from the lower prices publishers could charge for their games and in-game products on rival platforms. Consumers would also benefit from the lower market-wide platform fees that would prevail in a competitive market because, like other costs, all platform fees (including Valve's) are absorbed into the prices game publishers charge consumers. Those fees, and thus prices, would be lower in a market functioning without Valve's PMFN.

8. Valve's PMFN prevents this competition to maintain Valve's stranglehold on the market. By strictly barring discounts (or enhanced content) on rival platforms, Valve's PMFN requires Steam publishers to charge the same price (for the same content) wherever those games and in-game products are sold, even though underlying platform fees can vary significantly. This thwarts rival platforms' ability to seize market share from Valve by offering lower platform fees. To the extent rival platforms do offer lower fees, Valve's PMFN prevents publishers from reducing prices on their games to steer consumers to these platforms. Instead, to recoup costs, publishers must bake Valve's anticompetitive fees into a supracompetitive, uniform price and impose it wherever those games and in-game products are sold.

CLASS ACTION COMPLAINT - 3
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

9. The anticompetitive effects of Valve's PMFN can also be seen in the lived experience of the PC gaming market. Time and time again, well-resourced platforms have tried to compete with Valve in the sale of PC games and in-game products—including Electronic Arts ("EA"), Microsoft, Amazon, and Epic—but the PMFN has prevented them all from gaining meaningful traction. Unable to offer consumers discounts (or better content) when they purchase from these rival platforms, game publishers have no meaningful ability to steer customers away from Valve to discipline Valve's pricing. The failure of these well-resourced rivals, and persistence of Valve' supracompetitive fees for over two decades, illustrates the durable monopoly power Valve exercises over the market.

10. Valve's anticompetitive restraints have generated blockbuster profits by any metric. Reports indicate that the Steam Store generated around $7.4 billion from game sales in 2021, meaning Valve earns approximately $2.2 billion annually from its 30% tax on Steam sales.[4] Remarkably, in 2021 Valve had just 79 dedicated Steam employees.[5] This means that the 30% tax Steam imposes (on game sales alone) is generating at least $28 million annually per Steam employee![6] That astonishing figure laps (many times over) the already high revenues-per-employee generated by the largest and most profitable technology companies in the world.

---

[4] VG Insights, *Global PC Games Market Report 2024* (Jan. 3, 2024), https://vginsights.com/insights/article/global-pc-games-market-report-2024.

[5] Kyle Orland, *Valve runs its massive PC gaming ecosystem with only about 350* employees, ARS TECHNICA, (July 17, 2024), available at: https://arstechnica.com/gaming/2024/07/valve-runs-its-massive-pc-gaming-ecosystem-with-only-about-350-employees/.

[6] These calculations are conservative because Steam's revenues have increased since 2021, reaching $9 billion in 2023. And while 2021 is the last year for which Steam employee head counts are publicly available, the total number of Steam employees has been consistently trending downwards. Finally, the above calculations only include Steam revenues on game sales, excluding the substantial additional revenue Steam generates from in-game transactions.

CLASS ACTION COMPLAINT - 4
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX



11.     And most of Steam's revenues are pure profit given the modest costs of maintaining an online game store and in-game payments platform.  Upstart PC game stores have determined that they can cover costs by charging 10% commissions *or less*.[7]  Valve is charging three times that, despite operating at scale and with the efficiencies accrued over nearly two decades of business.

12.     Valve's staggering profits have been generated at the expense of consumers who are overcharged when they purchase games and in-game content at inflated prices from Steam. The Plaintiffs in this proposed class action were not only injured by Valve's anticompetitive conduct, they are best-positioned to challenge it having overcome arbitration provisions in Valve's consumer-facing agreements.

13.     Specifically, in *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-00563 (W.D. Wash.), the court held that a delegation provision in Valve's consumer terms of use required that threshold issues of arbitrability—including the enforceability of Valve's consumer-facing

---

[7] Nelly, *Why not 90/10?*, DISCORD (Dec. 14, 2018), https://web.archive.org/web/20190326130854/https://blog.discordapp.com/why-not-90-10-3761ebef4eab?gi=ce1e3200843c.

CLASS ACTION COMPLAINT - 5
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

arbitration provision—be determined in arbitration.  *See* ECF No. 66 at 3.  Class plaintiffs often pull up stakes when arbitration is so compelled.  But the Plaintiffs in this action, who were not named plaintiffs to the *Wolfire* complaint, did not.  They retained separate counsel and mounted a sustained and ultimately successful challenge to the enforceability of Valve's arbitration provision.  Specifically, the named Plaintiffs won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable for both lack of notice and because it impermissibly seeks to bar public injunctive relief.

14.     By successfully challenging Valve's arbitration provision, Plaintiffs have demonstrated their ability to vigorously prosecute this action on behalf of the proposed class.  Moreover, unlike the only other consumers to have challenged Valve's PMFN, the Plaintiffs in this case will not be undermined by any conflict of interest.  In the *Wolfire* action, the same lawyers have purported to represent both consumers and game publishers challenging Valve's PMFN.  But while these groups may each wish to challenge Valve's conduct, their interests diverge irreconcilably, particularly when it comes to assessing the anticompetitive effects of the PMFN and measuring damages.

15.     Plaintiffs seek to hold Valve fully accountable for its anticompetitive conduct. Asserting monopolization and tying claims under the Sherman Act, as well as unfair competition claims under applicable state law, Plaintiffs seek all available remedies needed to redress their injuries, along with public injunctive relief that reintroduces competition into the PC gaming market to benefit the public at large.

## II.     PARTIES

**A.     Plaintiffs**

16.     Plaintiff John Elliott is a resident of California. Mr. Elliott has purchased PC games through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Elliott has paid supracompetitive prices for PC games.

17.     Plaintiff Ricardo Camargo is a resident of California. Mr. Camargo has purchased PC games through the Steam Store.  As a result of Defendant's anticompetitive practices, Mr. Camargo has paid supracompetitive prices for PC games.

CLASS ACTION COMPLAINT - 6
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

18.     Plaintiff Javier Rovira is a resident of Florida. Mr. Rovira has made PC games and in-game purchases through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Rovira has paid supracompetitive prices for his purchases.

19.     Plaintiff Bradly Smith is a resident of Missouri. Mr. Smith has purchased PC games through the Steam Store. As a result of Defendant's anticompetitive practices, Mr. Smith has paid supracompetitive prices for PC games.

**B.     Defendant**

20.     Defendant Valve Corporation is a Washington Corporation with a principal place of business at 10400 NE 4th Street, Suite 1400, Bellevue, Washington, 98004-5174. Valve, an American video game developer, publisher, and digital distribution company, operates a PC gaming platform (the "Steam Gaming Platform") and is a distributor of PC games through the Steam Store.  Valve also separately provides payment processing services for purchases made within PC games distributed through the Steam Store.

### III.     JURISDICTION AND VENUE

21.     Plaintiffs bring this action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to recover treble damages and costs of suit, including reasonable attorneys' fees, against Valve for the injuries to Plaintiffs and the Class, alleged herein, arising from Valve's violations of Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiffs also assert claims under Washington's Consumer Protection Act, RCW 19.86, seeking treble damages and injunctive relief under RCW 19.86.090, as well as claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, et seq., seeking restitution, injunctive relief, and other available remedies.

22.     The Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, as well as pursuant to 28 U.S.C. §§ 1331 and 1337(a). The Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Valve because Valve's headquarters are located in this judicial district, specifically in Bellevue, Washington. Valve has engaged in

CLASS ACTION COMPLAINT - 7
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

sufficient minimum contacts with the United States and has purposefully availed itself of the benefits and protections of both the United States and Washington such that the exercise of jurisdiction over Valve would comport with due process.

24.     Valve also is subject to personal jurisdiction because, either directly or through its agents or affiliates, Valve transacted business throughout the United States, including in this District, that was directly related to the claims at issue in this action.

25.     Additionally, the Court has jurisdiction over Valve because Valve's principal place of business is in Washington State.

26.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a) and 22 because Valve is found in and transacts business in this District.

27.     Venue also is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d) because, during the relevant period, Valve resided, transacted business, was found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein was carried out in this District.

## IV.     JUSTICIABILITY

28.     In 2021, a group of game consumers and a game publisher filed a class action complaint in the United States District Court for the Western District of Washington, alleging that Valve engages in anticompetitive practices to monopolize PC gaming markets. *See* Class Action Compl., *Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-00563 (W.D. Wash. Apr. 27, 2021), ECF No. 1.

29.     Valve moved to compel arbitration of the consumers' claims, relying on an arbitration clause in the fine print of its consumer-facing terms of use.  Specifically, consumers wishing to purchase games through the Steam Store must check a box to indicate their agreement to the terms and conditions of Valve's Steam Subscriber Agreement ("SSA") before completing a purchase.

30.     Consumers in the *Wolfire* action contested the enforceability of the arbitration provision but the Court ruled that the threshold issue of arbitrability was delegated to, and

CLASS ACTION COMPLAINT - 8
Case No. 2:24-cv-01218
011258-11/2686081 V1


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

needed to be resolved in, arbitration.  The Court accordingly granted Valve's motion to compel arbitration.  *See id.* ECF No. 66.

31.     Plaintiffs to this class action complaint were not named plaintiffs in the *Wolfire* action.  They retained separate counsel and asserted individual claims in arbitration challenging the enforceability of Valve's arbitration provision.  Each prevailed, obtaining rulings that the arbitration provision was unenforceable, either for lack of notice, or because it purports to preclude public injunctive relief in violation of the McGill rule (*McGill v. Citibank*, *N.A.*, 393 P.3d 85, 90-92 (Cal. 2017)), or both.  The arbitrator thus granted each Plaintiff's motion to dismiss the arbitration.

## V.     BACKGROUND

**A.     Valve transforms itself from a PC game publisher to a platform monopolist.**

32.     Valve Corporation was founded in 1996 by two former Microsoft employees. The company quickly made a name for itself in the PC gaming industry with its first product, "Half-Life," released in 1998. Following this success, Valve continued to release influential titles, including "Counter-Strike," "Team Fortress," "Portal," "Left 4 Dead," and "Dota 2."

33.     In addition to being a game developer, Valve operates by far the largest PC gaming platform in the world, Steam, where users can purchase PC games directly from third-party game publishers. Valve first released Steam in 2003. What started off as a digital platform to provide automatic updates to Valve's games quickly evolved into a comprehensive PC gaming distribution platform for thousands of creators and publishers to deliver content while enabling millions of game players to purchase, download, and manage games.[8]

34.     As a PC gaming marketplace, Steam provides an extensive library of games from third-party publishers for Steam users. As of 2024, Steam hosts over 73,000 games, with over 14,000 games being published in 2023 alone.[9] The platform allows users to manage their game

---

[8] Valve Corp., *About Us*, https://www.valvesoftware.com/en/about (last visited Aug. 7, 2024).

[9] J. Clement, *Steam gaming platform – Statistics & Facts*, STATISTA (Jan 10, 2024), https://web.archive.org/web/20240713180659/https://www.statista.com/topics/4282/steam/#topicOverview; Chris Kerr, *All signs suggest it was a record-breaking year for new releases on*

CLASS ACTION COMPLAINT - 9
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

libraries, download and install games, and automatically update their games. Steam also supports cloud saves, enabling users to save their progress online and access their game data from any device.

35.	In addition to PC games, Steam allows users to purchase in-game items, also known as "microtransactions," on its platform. Steam users can purchase virtual goods and services such as character skins, trading cards, and premium content within a game. Steam provides payment processing services for these in-game transactions (or microtransactions). Specifically, Steam offers a Steam Wallet, where players can add funds to make in-game transactions, as well as a payment processing platform through which game publishers can receive and clear funds spent on in-game products.

36.	Steam has become a "must have" PC game distribution channel for both large studios and indie developers, providing them with access to Steam's massive user base. As of 2019, Steam had over 1 billion registered accounts with 90 million active users and upwards of 14 million daily concurrent users.[10] In early 2024, Steam set new records with 33.7 million concurrent users and over 10.8 million users actively playing games simultaneously, underscoring its dominance in the PC gaming market.[11]

**B.	Having entrenched itself as the gateway to PC games, Valve extracts supra-competitive prices from sales on Steam.**

37.	For access to this expansive PC gaming marketplace, Valve demands significant fees on third-party game publishers. Indeed, Steam generates most of its revenue through a mandatory 30% tax on game sales and in-game transactions. Sales on the Steam Store have

---

*Steam*, GAME DEVELOPER (Jan. 2, 2024), https://www.gamedeveloper.com/business/latest-estimates-show-over-14-000-new-titles-launched-on-steam-in-2023

[10] Ryan Yuen, *The Rise of Steam: A Case Study o the Most Dominant Force in Gaming*, LINKEDIN (Nov. 21, 2021), https://www.linkedin.com/pulse/rise-steam-case-study-most-dominant-force-gaming-ryan-yuen

[11] Rich Stanton, *Steam kicks off 2024 with its highest-ever concurrents and player count*, PC GAMER (Jan. 8, 2024), https://www.pcgamer.com/steam-kicks-off-2024-with-its-highest-ever-concurrents-and-player-count/

CLASS ACTION COMPLAINT - 10
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

increased steadily, reaching $9.0 billion in 2023 for game sales alone, with Steam taking approximately 30% of the sale proceeds through its commission.[12]



Steam Market Size, Full Game Sale Revenue (2019-23, $bn)

38.  As a popular platform and early mover into online PC game distribution, Steam exercised significant market power when it set its 30% tax on game sales and in-game transactions.  While 30% was at the time a common commission rate for brick-and-mortar distribution of games, such distribution channels have substantially higher operational costs, including rent, utilities, staff salaries, and logistics for stocking and distributing games.

39.  As a primarily online distributor of digital content, Steam has far lower operational costs, and yet Steam was able to impose (and has retained ever since) a 30% commission on game distribution and in-game purchases.  Steam's ability to set its commission substantially above marginal costs is a testament to its substantial market power, both when the 30% fee was set and ever since.

## VI.  RELEVANT MARKETS

40.  A relevant antitrust market contains both a product dimension (the "product market") and a geographic dimension (the "geographic market"). Valve competes in two distinct

---

[12] VG Insights, *Global PC Games Market Report 2024* (Jan. 3, 2024), https://vginsights.com/insights/article/global-pc-games-market-report-2024.

CLASS ACTION COMPLAINT - 11
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

product markets: (1) the PC Game Distribution market, and (2) the PC In-Game Payment Processing market. The relevant geographic market is at least as large as the United States.

**A.      Both relevant product markets are limited to PC games.**

41.      Other types of games, such as console games and mobile games, are not a reasonable substitute for PC games.

42.      A PC game is specifically designed to be played on personal computers, utilizing the hardware and software capabilities of PCs, which can be customized and upgraded with various components such as graphics cards, processors, memory, and storage to enhance performance and graphics quality. In contrast, games for consoles utilize specialized plug-and-play hardware such as the PlayStation, Xbox, and Nintendo Switch. "Console gaming enthusiasts especially buy their new console versions just to play the latest games released. Therefore, we can say that gaming consoles have created a unique community of players."[13]

43.      While PC game players enjoy unparalleled performance and immersive experiences provided by powerful GPUs, CPUs, and RAM, mobile games, designed for smartphones and tablets, excel in portability and accessibility. Mobile games are specifically designed to be highly portable and accessible, making them convenient for on-the-go play.

44.      Gamers are unlikely to switch to a different gaming platform due to the significant investment they have made in one gaming ecosystem. For instance, a gamer who has built extensive game libraries and social networks on Steam is less inclined to buy the Xbox version of a game, even if they own an Xbox, due to the social and economic investments already made on Steam.

45.      Reflecting the distinct consumer base for PC games, and the unique experience PC gamers expect, a PC version of a game is generally compatible only with PCs and does not function across other platforms. For example, an Xbox version of a particular game is not interchangeable with a PC version of that same game due to the fundamental differences such as

---

[13] Starloop, *Mobile Games Vs. PC Vs. Console Games: What Market is the Best Bet?*, https://starloopstudios.com/mobile-games-vs-pc-vs-console-games-what-market-is-the-best-bet/ (last visited Aug. 7, 2024).

operating systems and hardware architecture. These differences ensure that each version is optimized for its specific platform, providing the best possible performance and user experience.

46. Gaming industry participants recognize PC games as distinct products from other types of games. GameStop, as a general video game distributor, lists PC gaming as a separate game type on its website.



47. The PC Game Distribution market satisfies the test for market definition used by federal antitrust enforcement agencies, widely known as the "SSNIP test." The test asks whether a hypothetical monopolist in a proffered market could profitably impose a small but significant (typically 5%), non-transitory increase in price (a "SSNIP"), without causing a sufficient number of customers to switch to other products or services such that the SSNIP would be unprofitable to the monopolist. If the SSNIP is profitable, the market is properly defined. If the SSNIP is not profitable, the market is too narrowly defined, and does not encompass sufficient economic substitutes.

48. Here, the PC Game Distribution market will pass a SSNIP test. For the reasons discussed above, a 5% increase in PC games' price would not cause a sufficient number of PC gamers to switch to console games (such that the increase would be rendered unprofitable). This is because the price increase would not outweigh the reasons many gamers prefer playing on PCs

CLASS ACTION COMPLAINT - 13
Case No. 2:24-cv-01218
011258-11/2686081 V1


1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and the significant investment they have made in building their game libraries and social networks on the platform.

49.    Valve also emphasized the distinctions between the different types of gaming markets in a response to a third-party subpoena in an antitrust case between Epic and Apple in the Northern District of California.[14] There, Valve acknowledged that "Apple, Google and Samsung compete with each other in the mobile app market. Valve does not compete in that market." Valve further asserted that there was "no evidence" suggesting that a "relevant market could be so broad as to include any video game available through any channel" and that there was little evidence that "iOS users owned multiple devices and changed from one to another in response to price changes."[15]

50.    Valve's concession that the mobile market and PC games market are different markets holds true for the console market as well. Valve does not sell, market, or compete in the market for console games.

## B.    First Relevant Product Market – PC Game Distribution

51.    Valve competes in the PC Game Distribution market.  In this market, Valve (and other lesser) platforms provide intermediation services allowing consumers to purchase, and game publishers to sell, PC games.  Participants in the PC Game Distribution market compete to attract gamers to their storefronts, while simultaneously competing to attract PC Game publishers willing to market their games through the platform.

52.    Publisher demand for game distribution is tied to consumer demand for distribution.  That is, a platform offering distribution of PC games is appealing to publishers only insofar as it is capable of reaching an audience of consumers willing to purchase PC games.  And vice versa.  A platform offering PC games is more appealing to consumers if it has attracted a large population of publishers and, accordingly, can offer a wide selection of quality games.

---

[14] *See, e.g.*, Jt. Letter Br. Re: Apple's Subpoena to Non-Party Valve Corp., *Epic Games, Inc. v. Apple, Inc.*, Case No. 4:20-cv-05640-YGR (N.D. Cal. Feb. 18, 2021), ECF No. 346.

[15] *Id.* at 6-7.



53.     Valve is a competitor in the PC Game Distribution market through the Steam Store. The Steam Store sells PC games that are enabled for the Steam Gaming Platform.

54.     Today most PC game distribution occurs digitally via the internet.  But this is a relatively new phenomenon. Widespread digital distribution of PC games did not begin in earnest until the 2000s. Prior to the 2000s, brick-and-mortar distributors were the dominant sellers of PC games.

55.     There were several smaller PC digital game distributors in the early 2000s, when the Steam Store launched. But, faced with Valve's quickly-obtained dominance and ability to compel gamers and publishers to the Steam Gaming Platform, those rival distributors were unable to gain a material foothold in the market and quickly folded. For example, early online distributor Stardock could not keep pace with Steam and was eventually purchased by GameStop in 2011.

56.     The trend toward digital distribution for PC games accelerated dramatically as a result of the global pandemic. Data published in January 2021 indicates that many consumers were increasingly spending their time at home playing PC games.[16] For example, at the beginning of the pandemic in March 2020, Steam saw its concurrent user count surge to what was then an all-time high of over 20 million gamers,[17] and the demand for distribution of PC games has only grown since then.

57.     According to Valve:

> While Steam was already seeing significant growth in 2020 before COVID-19 lockdowns, video game playtime surged when people started staying home, dramatically increasing the number of customers buying and playing games . . . . This has led to new highs for monthly active users (120.4 million), daily active users (62.6 million), peak concurrent users (24.8 million), first-time purchasers

---

[16] J. Clement, *Increase in video game sales during the coronavirus (COVID-19) pandemic worldwide as of March 2020*, STATISTA (Jan. 29, 2021), https://www.statista.com/statistics/1109977/video-game-sales-covid/.

[17] Noah Smith, *The giants of the video game industry have thrived in the pandemic. Can the success continue?*, WASH. POST (May 12, 2020), https://www.washingtonpost.com/video-games/2020/05/12/video-game-industry-coronavirus/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

(2.6 million per month), hours of playtime (31.3 billion hours), and the number of games purchased (21.4% increase over 2019).[18]

58. Overall, digital PC game sales increased from 20% of PC game sales in 2009 to 83% of PC game sales in 2018.[19]

59. For the reasons discussed above, PC games are not reasonably interchangeable with other categories of games. Distribution of PC games is therefore not reasonably interchangeable with distribution of other categories of games. There is not a significant positive cross elasticity of demand between the distribution of PC games and the distribution of other types of video games such as console or mobile games.

60. A hypothetical monopolist in the PC Game Distribution market could profitably impose a small but significant and non-transitory increase in price ("SSNIP") that, because of the factors addressed above, would not cause an unprofitable number of gamers or publishers to switch their desired format of games (for example, to console or mobile) and therefore switch away from the PC Game Distribution market.

**C.      Second Relevant Product Market – PC In-Game Payment Processing**

61. Once a PC Game has been sold in the distribution market, it offers a vehicle for further "in-game" transactions.  For example, publishers often monetize their games by selling gamers various in-game enhancements.  The range of in-game products available within PC games is endless, and includes in-game implements (a shield or magic spell), level unlocks, extra lives, and in-game currency, to take but a few examples.

62. A payment processing service is needed for consumers to purchase in-game products, and for publishers to sell them.  Payment processing services verify payment details, store user information, track payment history and process funds.  Payment systems of this sort are commonplace across industries and digital marketplaces.  They are a separate product from

---

[18] *Steam - 2020 Year in Review*, STEAMWORKS (Jan. 13, 2021), https://store.steampowered.com/news/group/4145017/view/2961646623386540826.

[19] J. Clement, *Distribution of computer and video game sales in the United States from 2009 to 2018, by delivery format*, STATISTA (May 17, 2022), https://www.statista.com/statistics/190225/digital-and-physical-gamesales-in-the-us-since-2009.



the antecedent market in which consumers purchase PC games, i.e., the PC Game Distribution market. Payment processing services for in-game purchase can be offered separately and, in fact, are widely demanded separately by both consumers and publishers.

63. Valve offers in-game payment processing for games distributed through Steam. This is a distinct service offered by Valve.

64. Valve provides this functionality with a software solution—"microtransaction APIs"—that publishers can use to process in-game payments. Enabling this service involves a multi-step implementation process, separate and apart from the process publishers must follow to make their games available for distribution on the Steam Store.

65. While Steam publishers could use a variety of payment processing services to manage in-game purchases—or develop their own payment mechanisms—Valve strictly forbids them from using anything but Steam's Microtransaction APIs. And likewise, consumers who purchase a game from Steam and wish to later obtain in-game products are barred from using any payment mechanism other than their Steam Wallet. Valve's guidelines provide in this regard: "For in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet."[20]

66. Having barred consumers and publishers from using any alternative payment processor, Valve is able to impose the same supracompetitive 30% tax within the PC In-Game Payment Processing market that it does when distributing games in the PC Game Distribution market.

67. While Valve imposes the same fee in both markets, they are distinct, segregable products for which there is separate demand. The market proves this. For example, Epic, which operates the Epic Games Store, offers an in-game payments processing service. But unlike Valve, Epic allows game publishers who sell their games on the Epic Games Store to choose whatever payment processor they wish to use for in-game purchases. And payments providers have stepped in (e.g., Xsolla) to provide this freestanding product. This demonstrates that PC In-

---

[20] Steamworks Documentation, *Microtransactions (In-Game Purchases)*, https://partner.steamgames.com/doc/features/microtransactions (last visited Aug. 7, 2024).

CLASS ACTION COMPLAINT - 17
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

Game Payment Processing is a separate, freestanding product that is not subsumed within the antecedent market for PC Game Distribution. There is separate demand for PC In-Game Payment Processing.

68. A competitive market for PC In-Game Payment Processing would offer consumers widespread choice between competing payment processors for in-game payment processing services, including on games distributed through the Steam Store. Those servicers could compete on fees, and there is much room for competition given that the going rate for payment processing hovers around 4%, just a small fraction of the 30% Valve charges for the same service. Rival payment processors would also compete on quality, offering more innovative, secure, and reliable payment processing services to attract consumers and enhance their gameplay. Valve's prohibition on rival payment processing services insulates Valve from this competitive threat and allows it to maintain supracompetitive fees that get absorbed into the prices consumers pay whenever they purchase in-game products.

**D.      Geographic Market**

69. Participants in the PC Game Distribution market and PC In-Game Payment Processing market operate worldwide and distribute PC games and in-game payment processing service across national boundaries, including digitally over the internet. Accordingly, the relevant geographic dimension for both product markets is at least as broad as the United States.

## VII.    VALVE POSSESSES MONOPOLY POWER IN THE RELEVANT MARKETS

**A.      Valve dominates the PC Game Distribution Market and the PC In-Game Payment Processing Market.**

70. Valve is the dominant distributor of PC games, with at least a 75% market share of the PC Game Distribution market. Within the market for PC In-Game Payment Processing, Valve processes 100% of in-game purchases for games acquired through the Steam Store, such that Valve's market share for the entire PC In-Game Payment Processing market is likely to approximate its 75% share of PC Game Distribution.

CLASS ACTION COMPLAINT - 18
Case No. 2:24-cv-01218
011258-11/2686081 V1


**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

71.     Due to its large market share and user base, game publishers generally consider Steam a must-have. As put by one game publisher, "As a developer, it's scary to have one entrenched company dominating all of PC games since we are completely at Valve's mercy."[21]

72.     The vast majority of all PC games are played today on Steam. As explained by an EA executive, PC game publishers "want to be where the players are," which in the case of PC games means Steam.[22] During the COVID-19 pandemic, for example, there were more than 22 million users on the Steam Gaming Platform in a single day, and over 6.2 million gamers playing games at the same time.[23]  The popularity of the Steam Gaming Platform reinforces the market power of the Steam Store, further entrenching its dominant position in the marketplace.

73.     Very few PC games have found success outside of Steam, and such games typically require a long history of recognition and success before they can attempt to thrive without distribution through the Steam Store.  Such games are rare—the Steam Store has over 70,000 games available whereas the number of PC game franchises that can avoid Steam entirely can be counted on two hands.

74.     Moreover, other outlets for PC games— including Amazon, GameStop, Walmart, Target, and online storefronts, like Green Man Gaming and Humble Bundle—all sell Steam Keys. A Steam Key is a digital "key" that allows the customer to download and maintain the game through the Steam Gaming Platform, and only through the Steam Gaming Platform. Valve controls if and how many Steam Keys a developer can sell, and Valve can deactivate these keys if it chooses. Thus, Steam Key retailers are actually selling Valve's product and extending Valve's control of the PC Game Distribution market.

[21] Nick Statt, *Epic vs. Steam: the console war reimagined on the PC*, THE VERGE (Apr. 16, 2019), https://www.theverge.com/2019/4/16/18334865/epic-games-store-versus-steam-valve-pcgaming-console-war-reimagined.

[22] Chaim Gartenberg, *EA games are returning to Steam along with the EA Access subscription service*, THE VERGE (Oct. 29, 2019), https://www.theverge.com/2019/10/29/20937055/ea-gamessteam-access-subscription-service-pc-storefront-jedi-fallen-order-sales.

[23] James Batchelor, *Record number of Steam users online during coronavirus outbreak*, GAMESINDUSTRY.BIZ (Mar. 14, 2019), https://www.gamesindustry.biz/discord-game-store-refocuses-on-nitro-subscription-as-servers-allow-devs-to-sell-games-directly.

CLASS ACTION COMPLAINT - 19
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

75.     As addressed above, Valve further dominates the PC In-Game Payment Processing Market by strictly foreclosing rival payment processors from offering their services for in-game purchases within games distributed through the Steam Store.  Hoarding these valuable in-game transactions for itself, Steam imposes its 30% tax whenever Steam gamers make an in-game purchase.

76.     Given its unassailable dominance, Valve has the ability to increase prices and reduce output in both relevant markets, *i.e.*, monopoly power.

**B.     Barriers to entry are high.**

77.     The PC Game Distribution market and PC In-Game Payment Processing market have substantial barriers to entry. These barriers are typical of technology platforms, and include network effects,[24] switching costs,[25] and the accumulation of data,[26] among other factors.  All of these barriers to entry apply to both relevant markets.

78.     Network effects are the feedback loop of demand that can be generated by a platform that mediates successfully between two groups of users.  With respect to gaming platforms like Steam, the more consumers that frequent the platform, the more attractive it is to publishers.  Likewise, consumers value a gaming platform that has attracted a large body of publishers, because this ensures a wide selection of high-quality games.  Network effects make it difficult to compete against Steam, an incumbent with a large base of users and publishers.  To seize meaningful market share—for either PC Game Distribution or PC In-Game Payment Processing—a would-be competitor must harness the same network effects by appealing to large numbers of users on both sides of the platform.  This is a difficult hurdle for startup platforms, and even well-resourced technology companies, to clear.

---

[24] Majority Staff of H. Subcomm. on Antitrust, Com. & Admin. Law of the Comm. on the Judiciary, 116th Cong., *Investigation of Competition in Digital Markets* at 40 (Oct. 6, 2020), available at https://democrats-judiciary.house.gov/uploadedfiles/competition_in_digital_markets.pdf ("Digital Markets Report").

[25] *Id.* at 41.

[26] *Id.* at 42-44.

CLASS ACTION COMPLAINT - 20
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

79.     Switching costs also create barriers to entry.  While users can theoretically operate on multiple PC gaming platforms, once they have accumulated a game library, game achievements, and a social network on one platform, switching platforms means starting from square one.  This discourages switching platforms and, accordingly, makes it difficult for new entrants to compete with Valve.

80.     Valve also enjoys a structural advantage over entrants due to the substantial amount of data it gathers on game usage, game preferences, social networks, and other facets of gameplay.  With enormous amounts of data at its fingertips, Valve is able to better market its products and identify commercial opportunities than are would-be competitors.  It is well recognized that such data collection advantages incumbents and "can serve as another powerful barrier to entry for firms in the digital economy."[27]

81.     Barriers to entry in the PC In-Game Payment Processing market are also erected by Valve's complete prohibition on rivals offering payment processing services for games distributed through the Steam Store.  Absent that prohibition, rival payment processing services could readily serve the market and compete with Valve.  But exercising substantial market power in the upstream distribution market, Valve is able to severely restrict access to the PC In-Game Payment Processing market.  A would-be entrant in this market can only offer its services on PC gaming platforms other than Steam.  Because Steam dominants the market, this makes it exceedingly difficult for payment processing services to profitably enter.

**C.     Valve's supracompetitive prices and ability to restrict output provide direct proof of its monopoly power.**

82.     In a competitive market, prices tend toward marginal costs, or the cost of producing one additional unit of the product sold.  It is readily apparent that Valve's 30% take rate on game distribution and in-game payment processing is grossly above Valve's marginal costs and, thus, supracompetitive.

83.     Other gaming platforms have reported that, despite lacking the Steam Store's scale and accrued efficiencies, they could remain profitable charging just 10-12%, or even less,

---

[27] *Id*. at 42.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

in platform fees.  Epic Games has acknowledged in court filings that "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."  Epic's CEO, Tim Sweeney, has further confirmed that "[f]ixed costs of developing and supporting the platform become negligible at a large scale.  In our analysis, stores charging 30 per cent are marking up their costs by 300 to 400 per cent."[28]

84.     Gaming platform Discord likewise launched with a 10% platform fee, observing that this "covers [the store's] operating costs," and that the platform would "explore lowering it [further] by optimizing our tech and making things more efficient."[29]

85.     In a competitive market, Valve's platform fees would be driven down to a competitive level closer to its marginal costs.  Valve has never faced this competition.  Insulating itself with PMFN and tying restraints, Valve has been able to sustain a 30% take rate from the inception of its platform.  Valve's ability to sustain these high fees over a roughly 20-year period, despite historic advancements in digital distribution tools and motivated would-be competitors, is a testament to the enormous market power Valve exercises in both relevant markets.

## VIII.   STEAM HAS UNLAWFULLY MONOPOLIZED THE RELEVANT MARKETS

86.     Valve does not dominate the PC Game Distribution and PC In-Game Payment Processing Markets through competition on the merits.  Rather, Valve has built and maintained monopoly power through anticompetitive restraints.

### A.     Valve's PMFN restricts price competition.

87.     To insulate itself from competition, Valve has imposed a PMFN on game publishers who list their games in the Steam Store.  Like PMFNs generally, Valve's PMFN compels publishers to sell their games and in-game product at the Steam Store price (or higher)

---

[28] Seth Barton, *New Epic Games Store Takes on Steam with just 12% revenue share – Tim Sweeney answers our questions*, MCV/DEVELOP (Dec. 4, 2018), available at: https://mcvuk.com/development-news/new-epic-games-store-takes-on-steam-with-just-12-revenue-share-tim-sweeney-answers-our-questions/.

[29] Discord, *supra* note 7.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

in all distribution channels, including distribution channels that are not connected to Steam, and distribution channels that offer more favorable pricing (i.e., fees substantially below Valve's 30% tax).

88.     Valve's PMFN has been formulated differently over time, and has been expressed in both written and unwritten rules and guidance.  It has never been lifted and remains in effect today.  In all iterations, Valve's PMFN serves to thwart price competition that might undermine Steam's market dominance.  As Epic Games' CEO put it:  "Steam has veto power over prices, so if a multi-store developer wishes to sell their game for a lower price on the Epic Games store than Steam, then: 1.) Valve can simply say 'no.'"[30]

89.     Valve maintains active oversight over pricing.  Steam's guidelines provide that publishers' "[i]nitial pricing as well as proposed pricing adjustments will be reviewed by Valve and are usually processed within one or two business days."[31]  This oversight allows Valve to maintain attentive review of pricing, and pricing changes on Steam to enforce PMFN compliance.

90.     With the PMFN, Valve controls—including through punishment and threats—publishers who attempt to use pricing incentives (i.e., discounts) to steer customers to alternative distribution channels for PC games and in-game products. If publishers do not abide by Valve's mandates, they risk losing access to the Steam platform altogether, which can be devastating given that most PC gamers use Steam.

91.     Valve's PMFN is particularly insidious because it distorts competition over not only Steam-enabled versions of PC games, but *all* PC games.  That is, the PMFN applies not just to games that can be played on Steam, but also to alternative versions of the same game that have been developed for alternative gaming platforms.

92.     The PMFN severely restricts competition from rival distribution channels.  To effectively compete against Valve, rival platforms need to draw significant numbers of gamers

---

[30] Sweeney, *supra* note 2.

[31] Steamworks Documentation, *Store Presence, Pricing*, https://partner.steamgames.com/doc/store/pricing (last visited Aug. 7, 2024).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and publishers onto their platform, harnessing the network effects of platform economics. The most direct means of doing this is to reduce publishers' fees (i.e., the platform's commission). This accomplishes two things, at least in a competitive market. It encourages publisher participation on the platform because publishers want to pay lower platform fees. It also (absent the PMFN) gives the publishers the ability to reduce prices to steer customers onto the platform (and away from Steam).

93. But with its PMFN, Valve controls publishers' retail prices and effectively sets a price floor across the entire market. With Valve's PMFN in place, even if a rival platform charges commissions lower than Valve's 30%, publishers cannot draw gamers onto the rival platform by offering lower prices on that platform. They have to charge the same uniform price across the market. They also have to provide users with the same content across platforms. This leaves gamers with little incentive to switch away from Steam.

94. Valve has a long history of enforcing its PMFN. For example, it invoked the PMFN to block competition from the Discord Store. As detailed further below, Discord attempted to compete with Steam by launching a game distribution store that charged a 10% commission (a third of Steam's). Naturally, publishers saw Discord as an opportunity to secure a greater revenue share on the distribution of their games and in-game products and were incentivized to steer gamers to the platform with favorable pricing. Valve stymied this with the PMFN, barring publishers from offering discounts on Discord.

95. Valve also has explicit rules setting forth the PMFN. Valve's guidelines state emphatically: "You should use keys to sell your game on other stores in a similar way to how you sell your game on Steam. <u>It is important that you don't give Steam customers a worse deal than Steam Key purchasers</u>.[32] While nominally about Steam Keys, Valve has made clear to publishers that the same rules apply to all sales. In response to one inquiry from a game publisher, for example, Valve explained: "*We basically see any selling of the game on PC, Steam key or not, as a part of the same shared PC market- so even if you weren't using Steam keys,*

---

[32] Steamworks Documentation, *Steam Key Rules and Guidelines*, https://partner.steamgames.com/doc/features/keys (last visited Aug. 7, 2024).

CLASS ACTION COMPLAINT - 24
Case No. 2:24-cv-01218
011258-11/2686081 V1



*we'd just choose to stop selling a game if it was always running discounts of 75% off on one store but 50% off on ours. . . .*"

96.     A prior version of the same guidance similarly stated: "You are welcome to generate keys for resale with other retailers, including your own website. However, your product must also be available for sale on Steam. If you are hoping to receive exposure to Steam customers, the price on Steam will have to match prices elsewhere."[33] Valve threatened to delist any developers (strip them of "exposure to Steam customers") if they offered consumers discounts on rival platforms, even platforms offering better publisher economics.

97.     Publishers are reminded of these restrictions whenever they request Steam Keys, with the online screen flows requiring that they confirm:  "I understand that I need to sell my game on other stores in a similar way to how I am selling my game on Steam" and "I agree that I am not giving Steam customers a worse deal." The publisher must also agree that "I understand that while it's OK to run a discount on different stores at different times, I agree to give the same offer to Steam customers within a reasonable amount of time." Again, as discussed above, Valve enforces these rules against publishers not only for Steam Key games, but for all games.

98.     Valve also tells publishers that Valve enforces this provision to "*avoid a situation where customers get a worse offer on the Steam store.*"[34] Put another way, Valve uses its PMFN to prevent gamers from getting a better deal from any Steam Store competitors.

99.     Steam imposes the PMFN through more informal guidance as well.  Steamworks Development is a forum where publishers interact with Valve employees. On this forum, when one publisher asked Valve about the "rules regarding distributing/selling a game outside of steam" in a thread called "Patreon and steam keys" dated July 2, 2017, "TomG" of Valve explained how the policing system works: "*The biggest takeaway is, don't disadvantage Steam customers.* For instance, it wouldn't be fair to sell your DLC [downloadable content] for $10 on

---

[33] Steamworks Documentation, *Steam Key Rules and Guidelines* (Sept. 1, 2017), https://web.archive.org/web/20170901192842/https://partner.steamgames.com/doc/features/keys.
[34] Steamworks Documentation, *Steam Key Rules and Guidelines*, *supra* note 33.

CLASS ACTION COMPLAINT - 25
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

Steam if you're selling it for $5 or giving it as a reward for $5 donations. We would ask that Steam customers get that lower $5 price as well."

100. This response reflects the twisted "fairness" rationale Valve has used to justify its PMFN. There is nothing "unfair" about consumers receiving discounts game publishers wish to provide them. What is unfair is Valve's sustained efforts to prevent these discounts from happening so that Valve can maintain its market dominance and 30% tax on gaming transactions.

101. The same "TomG" also explained to another game publisher that the publisher should "[t]hink critically about how your decisions might affect Steam customers, and Valve. *If the offer you're making* fundamentally *disadvantages someone who bought your game on Steam*, it's probably not a great thing for us or our customers (even if you don't find a specific rule describing precisely that scenario)." In that same thread, TomG responded to a question by stating: "*we usually choose not to sell games if they're being sold on our store at a price notably higher than other stores.* That is, we'd want to get that lower base price as well, or not sell the game at all."

102. Additional examples of Valve's PMFN enforcement abound. On December 3, 2018, for example, a Steam account manager, Tom Giardino, reportedly told publisher Wolfire that Steam would delist any games available for sale at a lower price elsewhere, whether or not using Steam keys. A Valve employee told another developer that if he "brought a particular other game of [his] to Steam, it would need to be equivalently priced. This was regardless of whether the non-[S]team version use Steam technology[,] [*i.e.*], a completely standalone version would have to be the same price as the Steam version."

103. Valve has gone so far as to prevent publishers from telling consumers about its 30% fee. While publishers can advertise alternative storefronts, publishers cannot disclose to gamers the amount of the commission Valve collects. This prevents even more subtle price steering to stores where the publisher may be able to collect a better revenue share.

CLASS ACTION COMPLAINT - 26
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

**B.** **Valve restricts competition by tying PC In-Game Payment Processing to PC Game Distribution.**

104.   Once a game has been purchased in the PC Game Distribution market, publishers can offer enhancements within their games for purchase.  These in-game transactions (what Valve calls "Microtransactions"), when offered, cannot be accomplished through a PC game distribution platform.  Rather, to complete these transactions, publishers must use a PC In-Game Payment Processing service.

105.   For games obtained from the Steam Store, there is no technological reason why publishers could not provide, or consumers could not select between, different PC In-Game Payment Processing services.  Valve, however, strictly forbids this.  It mandates that Steam consumers only use their Steam Wallet for in-game purchases, and that developers offer payment processing through a set of Valve "microtransaction APIs."  The Valve publisher guidelines are explicit on this:[35]

In-Game Purchase Requirements

For any in-game purchases, you'll need to use the microtransaction API so Steam customers can only make purchases from the Steam Wallet. You can learn more about how to complete this integration in the Microtransactions Implementation Guide.

You can use the Steam Wallet to purchase individual items or to purchase your in-game currency.

106.   By mandating the use of its own payment processing tools, Valve ensures that it can extract its 30% tax from all in-game purchases on games distributed through Steam.  This way, Valve gets its tax both at the front end (when the game is purchased) and at the back end, when the game is played.

107.   This tie-in not only helps maintain Valve's monopoly in the PC In-Game Payment Processing Market, it also constitutes an unlawful tying arrangement that (standing alone) violates Section 1 of the Sherman Act.

---

[35] Steamworks Documentation, *Microtransactions*, *supra* note 21.

CLASS ACTION COMPLAINT - 27
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

## C.   Valve's PMFN and tying conduct have severe anticompetitive effects.

### 1.   Valve's PMFN suppresses competition and causes consumers to pay higher prices.

108.   There are well-known anticompetitive effects that result from the imposition of MFN clauses by companies with market power, including higher prices to consumers.[36] MFN provisions mandate that suppliers provide equally favorable terms to the company imposing the MFN as granted to any of its rivals.

109.   Platform MFNs (or "PMFNs") are MFNs imposed by platforms.  They require that providers using the platform not offer their products or services at a lower price on other platforms. Economists increasingly recognize that PMFNs in particular can harm competition and consumers by "keeping prices high and discouraging the entry of new platform rivals."[37] PMFNs guarantee that other platforms cannot charge a "lower final price, not because the focal platform has worked to ensure that it has the lowest cost, but rather because it has contracted for competitors' prices to be no lower."[38]

110.   By imposing a PMFN, Valve ensures that the retail prices set in the Steam Store are equal to or better than the prices offered in any rival distributor's storefront. Thus, Valve's PMFN gives Valve the ability to prevent price competition from rival storefronts.

111.   PMFNs disincentivize sellers (here, game publishers) from offering low prices in any channel, because discounts must be offered to all buyers.[39]

112.   PMFNs also make it difficult to profitably enter the market to compete with an incumbent platform imposing the PMFN.  The main way a rival platform might compete is by offering lower platform fees to attract sellers who could discount their own prices (due to the lower platform fees) to generate additional volume at potentially higher margins.  But if the

---

[36] *See* generally Steven C. Salop & Fiona Scott Morton, *Developing an Administrable MFN Enforcement Policy*, 27 ANTITRUST ABA No. 2 15, 18 (Spring 2013).

[37] Jonathan B. Baker & Fiona Scott Morton, *Antitrust Enforcement Against Platform MFNs*, 127 YALE L.J. 2176, 2201 (May 2018) ("Baker I").

[38] *Id*. at 2178.

[39] *Id*. at 2179.



incumbent platform has a PMFN, the seller cannot differentiate its prices across platforms and "[t]his parity undermines the entrant's business model by preventing it from making an attractive offer to customers."[40]  This is precisely how Valve's PMFN operates.  It requires any game publishers selling through the Steam Store to set the same price on any rival or entrant's platform.  This prevents such rival or entrant platforms from making attractive offers to both publishers and consumers.

113.    When a company imposes a PMFN prohibiting lower prices on other platforms, that provision "serves to suppress competition on the crucial dimension of price[,]" and keeps new entrants from undercutting the dominant platform's commission, and, but for the PMFN, driving consumers to the rival platform.[41]

114.    Economic modeling demonstrates that when a dominant platform requires its sellers to agree to a PMFN, (a) there are higher platform fees; (b) there are higher retail prices; and (c) firms with lower-cost models are discouraged from entry.[42] As shown in the Boik & Corts model, for example, a lower price entrant (such as Discord, discussed herein) cannot successfully enter because the PMFN does not allow the entrant to lower prices to attract both consumers and publishers.[43]

115.    Additionally, PMFNs "tend to raise industry prices" because they "kill a retailer's incentives to compete in the terms of trade that it offers suppliers. The reason is that a retailer who raises the commission it charges . . . knows that the price set through its store will not increase relative to that at other stores. . . . This means that suppliers cannot asymmetrically

---

[40] *Id*. at 2180.

[41] Benjamin Edelman & Julian Wright, *Price Restrictions in Multi-sided Platforms: Practices and Responses*, 10 COMPETITION POL'Y INT'L 86 (Jan. 30, 2015).

[42] Andre Boik & Kenneth S. Corts, *The Effects of Platform Most-Favored-Nation Clauses on Competition and Entry*, 59 J.L. & ECON. 105, 113–29 (Feb. 2016).

[43] *See also, e.g.*, Amelia Fletcher & Morten Hviid, *Broad Retail Price MFN Clauses: Are They RPM "At Its Worst"?*, 81 ANTITRUST L.J. 1, 74 (2016) ("[MFNs] can restrict entry at the retail level. Specifically, they can disadvantage potential retail competitors with low-end business models by eliminating such an entrant's ability to win customers away from the incumbent through cutting its own margin and offering lower prices.").

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

adjust their prices to divert demand towards retailers offering more attractive contractual terms."[44]

116. PMFNs thus "harm competition by assisting an incumbent in foreclosing the entry or expansion of rivals."[45] PMFNs harm competition "by making it impossible for a dominant incumbent firm's rivals, including entrants, to bargain . . . for a low price."[46]

117. Real world examples show that, when PMFNs are banned, prices to consumers fall.[47] The leading hotel-booking site in the EU responded to an MFN ban by introducing quality improvements to the service it provided,[48] suggesting online platform competition increased when PMFNs were banned.

118. The impact of Valve's PMFN is evident in game prices across platforms. It would be in the economic self-interest of a publisher to sell its games for lower retail prices through lower-commission distributors. If another distributor charges a lower commission, the publisher could lower prices on the rival distributor, steering customers towards the rival distributor, or compel Valve to lower Valve's own supracompetitive commissions.

119. Due to Valve's PMFN, however, prices are remarkably consistent across distributors, regardless of each distributor's platform fees. To illustrate, the following chart shows prices from the Steam Store, the Epic Games Store, and GameStop websites as of August 2024. Many more examples are available, with these examples being provided only for illustrative purposes.

---

[44] Justin P. Johnson, *The Agency Model and MFN Clauses*, 84 REV. ECON. STUD. 1153–54 (Jan. 2017).

[45] Jonathan B. Baker & Judith A. Chevalier, *The Competitive Consequences of Most-Favored- Nation Provisions*, 27 ANTITRUST MAG. 24 (Spring 2013) ("Baker II").

[46] *Id.*

[47] Andrea Mantovani, et al., *The Dynamics of Online Hotel Prices and the EU Booking.com Case*, NET Institute Working Paper No. 17-04 (2017) at 2, http://ssrn.com/abstract_id=3049339 [http://perma.cc/W9K9-Y546].

[48] *See Id.* at 6 tbl.1.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

| Game Title | Price on Steam | Price on Epic Games Store | Price on GameStop |
|---|---|---|---|
| Horizon Forbidden West™ Complete Edition | $59.99 | $59.99 | $59.99 |
| RimWorld | $34.99 | $34.99 | N/A |
| Crosshair X | $7.99 | $7.99 | N/A |
| Red Dead Redemption 2 | $59.99 | $59.99 | $59.99 |
| Final Fantasy VII Remake Intergrade | $69.99 | $69.99 | $69.99 |
| Disco Elysium - The Final Cut | $39.99 | $39.99 | N/A |
| Hades II | $29.99 | $29.99 | N/A |
| The Last of Us™ Part I | $59.99 | $59.99 | $59.99 |
| Pacific Drive | $29.99 | $29.99 | $29.99 |

120. Uniform pricing across platforms with different commissions is not in the economic interests of consumers, who would benefit from discounts on lower-cost platforms. The following chart illustrates how normal differential pricing (which the PMFN prevents) would be profitable to publishers and provide better retail prices to consumers:

|  | STEAM | RIVAL PLATFORM |
|---|---|---|
| **Platform Fee** | 30% | 12% |
| **Price to Consumer** | $30.00 | $25.00 |
| **Developer Net Revenue (Price to Consumer – Platform Fee)** | $21.00 | $22.00 |

121. As shown, at a 12% commission, a game publisher could slash its prices from $30.00 to $25.00 and still earn more profit per unit sold. The consumer would pay $5 less—an enormous 17% savings—and be better off. The developer would earn $1 more and be better off. The rival platform would be better off because it would win the sale and earn a profit-generating 12% commission. The only party that would not benefit would be Valve, because it would lose the sale and earn nothing. Without the PFMN, Valve would face this type of competition again

CLASS ACTION COMPLAINT - 31
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

and again, and be forced to compete by lowering its commission down to the competitive level, with game prices falling commensurately.

### 2. Valve's tying conduct impedes competition and causes consumers to pay higher prices.

122.   In a competitive market for PC In-Game Payment Processing, a range of payment processing services could compete with Valve and the 30% tax it imposes for in-game payment processing.  There would be ample opportunity for competition to unfold, and it would be expected to be vigorous.  For one, there are many established firms that offer payment processing.  Some offer it across digital markets, e.g., PayPal.  Others are specific to gaming platforms, e.g., Xsolla.  These firms, and others, would be highly incentivized to compete in the lucrative PC In-Game Payment Processing market if they could access the dominant platform, Steam.  In addition, most payment processors charge per-transaction fees that come nowhere near the 30% Valve imposes.  Most payment processors' all-in rates hover in the 4% range.  Accordingly, entrants would have ample room to undercut Valve's fees to appeal to publishers and consumers.

123.   Facing competition from rival payment processors, Valve would never be able to sustain its 30% tax on in-game purchases.  As with any competitive market, Valve's pricing would be driven down toward marginal costs, which in the case of payment processing is infinitesimal.  Because payment processing fees, like all costs, are baked into the prices publishers charge for in-game products, consumers would be the ultimate beneficiaries of the lower payment processing fees that would prevail in a PC In-Game Payment Processing market operating without Valve's tying conduct.

## IX.   VALVE'S ANTICOMPETITIVE RESTRAINTS HAVE PREVENTED RIVAL PLATFORMS FROM SEIZING SIGNIFICANT MARKET SHARE.

124.   Many sophisticated and well-financed companies have tried to dethrone Steam by creating alternative channels for PC Game Distribution and PC In-Game Payment Processing.  None has put a meaningful dent in Steam's dominant position.  They have failed not because Steam provides a superior product to either publishers or consumers.  Indeed, rivals have developed gaming platforms that offered equivalent or better functionality, with lower

CLASS ACTION COMPLAINT - 32
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

commissions.  Rivals have failed because Valve's PMFN and tying conduct prevent meaningful competition on the merits.

## A.  Discord

125.    Discord is an application that offers text messaging, voice, and video calling for gamers to communicate with friends while playing a game.[49] Discord experienced rapid growth after launching in 2015, reporting 8.9 million daily users in 2017 and 100 million daily users in 2020.[50]

126.    In August 2018, Discord unveiled a game distribution platform in an effort to enter the relevant markets. It was described as the "biggest threat [Steam's] faced in years."[51] Discord in many ways was well-positioned to compete, since it already had an active gamer userbase using its platform for voice communications and social networking.  Discord also offered gamers and publishers promotions, such as exclusive periods of curated games being offered for free.[52] Discord also allowed all developers—regardless of size—to self-publish games.

127.    But most importantly, Discord offered superior economics—specifically a 10% standard commission rate.[53]  In a challenge to Valve's pricing, Discord openly questioned, "Why does it cost 30% to distribute games?"[54] Discord concluded that it "[t]urns out, it does not cost 30% to distribute games in 2018."[55] Discord settled on 10% because it "covers [its] operating

---

[49] Kaylee Fagan, *Everything you need to know about Discord, the app that over 250 million gamers around the world are using to talk to each other*, BUSINESS INSIDER (Oct. 12, 2020), https://www.businessinsider.com/how-to-use-discord-the-messaging-app-for-gamers-2018-5.

[50] *Id.*

[51] Stefanie Fogel, SuperData: *Discord Is a 'Major Threat' To Steam*, VARIETY (July 2, 2018), https://variety.com/2018/gaming/news/superdata-discord-vs-steam-1202863853/.

[52] Nelly, *Discord Store Global Beta Is Live!*, MEDIUM (Oct. 16, 2018), https://medium.com/discord-engineering/discord-store-global-beta-is-live-38bfd044d648.

[53] Discord, *supra* note 7; Austen Goslin, *In the race to beat Steam, the Discord Store just made a huge move*, POLYGON (Dec. 14, 2018), https://www.polygon.com/2018/12/14/18140790/discord-storeself-publishing-revenue-split.

[54] Discord, *supra* note 7.

[55] *Id.*

CLASS ACTION COMPLAINT - 33
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

costs," while adding, "we'll explore lowering it by optimizing our tech and making things more efficient."[56]

128. Despite all these factors, Discord never gained traction. By early 2019, Discord started "downscaling" its efforts in favor of a model where gamers would gain access to a pool of games for a monthly fee, a service called Nitro.[57] By October 2019, Discord announced the Nitro offering would be shut down.[58]

129. Valve's anticompetitive conduct made it impossible for Discord to meaningfully compete. Due to Valve's PMFN, publishers could not use price discounts or content improvements to steer gamers to Discord. If they did, they would be removed from the must-have Steam platform for violating the PFMN. As a result, Discord was unable to achieve the scale necessary to challenge Valve's monopoly or discipline its supracompetitive prices.

130. Adding insult to injury, Valve proceeded to copy many of Discord's most innovative features. For example, following Discord's lead, Valve introduced "Steam Chat," which provides a friends list, secure voice chat, and group channels. Industry analysts recognized that this "update takes many cues from Discord, including a suspiciously similar user interface" that looks "almost exactly the same."[59]

**B.      Microsoft, Amazon, Google**

131. In 2012, Microsoft released the Microsoft Store (formerly known as Windows Store) as its digital distribution platform, including for PC games. But despite its vast resources and unparalleled experience in digital markets, Microsoft was not able to gain a substantial market share from Steam. And recent events show that the competition has all but ceased, with Microsoft and Steam curiously collaborating in several areas.

---

[56] *Id.*

[57] James Batchelor, *Discord Game Store refocuses on Nitro subscription, devs can now sell games directly*, GAMEINDUSTRY.BIZ (Mar. 14, 2019), https://www.gamesindustry.biz/discord-game-store-refocuses-on-nitro-subscription-as-servers-allow-devs-to-sell-games-directly

[58] Nelly, *What's Coming for Nitro*, DISCORD (Sept. 12, 2019), https://discord.com/blog/whats-coming-for-nitro.

[59] Sean Wolfe, *The new and improved Steam Chat is here to take on Discord — here's how the two apps compare*, BUSINESS INSIDER (July 28, 2018), https://www.businessinsider.com/steam-chat-update-vs-discord-2018-7.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

132. Notably, in May 2019, Microsoft announced that it would bring more games to Steam. As an insider remarked on Microsoft's surrender, Microsoft "has given up entirely on that vision . . . to dethrone Steam."[60] Then in March 2021, Microsoft acquired Bethesda Games, a company that both made PC games and operated a nascent competitor to Steam, the Bethesda Launcher. In February 2022, Microsoft decided to shutter Bethesda, but rather than transition Bethesda games to Microsoft's own digital storefront, the Microsoft Store, Microsoft migrated those games and accounts to its supposed competitor Steam.

133. Amazon, through the Twitch Store, opened a joint platform/storefront in April 2017, heralded as "one of the biggest challenges yet to Steam."[61] It was shuttered 18 months later.[62]

134. Google also launched a competitive offering, Google Stadia, meant to be "the future of gaming."[63] Yet a February 26, 2021 article announced it has "absolutely crumbled under expectations."[64]

**C.      Epic Games Store**

135. The Epic Games Store ("EGS") is a platform and store offered by games publisher Epic.  Despite significant investment, Epic has been unable to mount a significant challenge to Steam's dominance due to Valve's anticompetitive conduct.

---

[60] Nick Statt, *Microsoft will distribute more Xbox titles through Steam and finally support Win32 games*, THE VERGE (May 30, 2019), https://www.theverge.com/2019/5/30/18645250/microsoft-xbox-game-studios-publishing-valvesteam-32-bit-windows.

[61] Rich McCormick, *Twitch will start selling games and giving its streamers a cut*, THE VERGE (Feb. 27, 2017), https://www.theverge.com/2017/2/27/14748896/twitch-sell-games-streamers-cut.

[62] Bryon Rose, *Twitch Game Store Shutting Down After November 27*, GAMEREVOLUTION (Nov. 16, 2018), https://www.gamerevolution.com/news/458393-twitch-game-store-shutting-down.

[63] Ian Sherr, *Google Stadia wants to be the future of gaming. So do Microsoft, Sony and Amazon,* CNET (Dec. 17, 2019), https://www.cnet.com/news/google-stadia-wants-to-be-the-future-of-gaming-so-do-microsoft-sony-and-amazon/.

[64] Cade Onder, *Damning Google Stadia Report Reveals Why It's Failing*, SCREEN RANT (Feb. 26, 2021), https://screenrant.com/google-stadia-damning-report-failing/.



136.     Epic is theoretically well-positioned to compete.  Epic is behind the gaming phenomenon, Fortnite, which earned over $4 billion between its launch in September 2017 and the summer of 2019.[65] Accordingly, just as Steam used its own popular game titles to launch the Steam Store, Fortnite's massive user base gives Epic a strong foundation to anchor a PC games store.  Epic was also motivated to offer a more equitable (yet still profitable) business model because, as Epic's CEO explained, "[s]tores extract an enormous portion of game industry profits and are ripe for disruption."[66]

137.     To attract publishers to its new storefront, Epic offered a much lower commission than the Steam Store: 12% instead of Valve's 30%. As Epic has stated in court documents, "Epic decided to charge developers a 12% revenue share after it concluded that 12% would be competitive, sufficient to cover its costs of distribution and allow for further innovation and investment in EGS."[67] Thus, like Discord found with its own 10% commission, Epic determined that a 12% commission was more than sufficient to cover costs and sustain profits needed to reinvest to innovate its storefront.

138.     EGS spent hundreds of millions on marketing and incentives to gain market share. But, even with these aggressive tactics, the EGS Store has been unable to move a significant share of the market away from Valve. Analyzing 2019 figures, one industry analyst explained that, despite its dogged efforts, EGS likely had a market share "a little above 2%."[68] Epic's sales have not increased significantly since, barely keeping abreast with inflation (if that).  Epic's year-end reports reveal that it generated $251 million in revenue from third-party games in 2019, with that number increasing only to $310 million by the close of 2023.

---

[65] Jason M. Bailey, *Fortnite Maker Wants to Sell More Games, and Build a Platform to Do It*, N.Y. TIMES (Aug. 27, 2019), https://www.nytimes.com/2019/08/27/business/steam-epic-games-store.html.

[66] *Id*.

[67] Findings of Fact and Conclusions of Law Proposed by Epic Games, Inc. at 134, *Epic Games, Inc. v. Apple, Inc.*, No. 4:20-cv-05640-YGR (N.D. Cal. Apr. 7, 2021), ECF. No. 407, https://cand.uscourts.gov/wp-content/uploads/cases-of-interest/epic-games-v-apple/Epic-Games-20-cv-05640-YGR-Dkt-407-Epic-Games-Proposed-Findings-of-Facts-and-Conclusions-of-Law.pdf.

[68] Avihay Hermon, *Epic Games Store, behind the numbers*, MEDIUM (Feb. 6, 2020), https://medium.com/@h.avihay/epic-games-store-behind-the-numbers-fe7ddef4e00c.

CLASS ACTION COMPLAINT - 36
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

139.    Valve's anticompetitive conduct is a major reason for EGS's failure. Because of Valve's PMFN, other publishers on EGS cannot discount their prices below those offered on Steam, preventing Epic from attracting users and building market share. Due to fear of retaliation from Valve, a publisher's only method of avoiding the PMFN is dropping Steam distribution entirely. But that is not an economically viable strategy for virtually all publishers, and therefore publishers have no choice but to comply with the PMFN. The result is that Epic's lower commission structure has not (and cannot) discipline Valve's supracompetitive 30% commission.

## X.    VALVE'S ANTICOMPETITIVE PRACTICES DIRECTLY HARM CONSUMERS

140.    The goal of the antitrust laws is "to protect the process of competition for the benefit of consumers, making sure there are strong incentives for businesses to operate efficiently, keep prices down, and keep quality up."[69] The Sherman Act is a "comprehensive charter of economic liberty aimed at preserving free and unfettered competition as the rule of trade." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958). "[T]he policy unequivocally laid down by the Act is competition." *Id.*

141.    Valve's PMFN and tying arrangement have blocked price competition and inhibited the ability of rival stores and platforms to function in a freely competitive market. This has allowed Valve to maintain its dominance in the relevant markets and maintain grossly inflated fees for game distribution and payment processing services, as alleged herein.

142.    While Valve assesses its 30% fee on game publishers, the publishers have a recourse.  Like any cost, publishers can (and do) build Valve's fees into the prices they charge consumers for PC games and in-game payment processing.  This is basic economics.  For firms to remain profitable, they must recoup their costs.  Game publishers are no different.  In a market operating without Valve's PMFN, competition between platforms would drive platform fees down across the market, resulting in lower marketwide prices for PC games and in-game

---

[69] FTC, *The Antitrust Laws*, https://www.ftc.gov/tips-advice/competition-guidance/guide-antitrust-laws/antitrust-laws (last accessed Aug. 7, 2024).

CLASS ACTION COMPLAINT - 37
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

purchases.  With lower platform fees, publishers would be incentivized to drop prices to spur additional sales volume.  As addressed in greater detail above, these incentives cannot be acted upon under the PMFN, and consumers are thereby deprived of discounts that would be available to them in a world with no Valve PMFN.

143.    Valve's anticompetitive conduct also decreases output.  By inflating prices, Valve has reduced demand for PC games and in-game products.  The lower prices that would prevail in a competitive market would increase demand, leading to more transactions in both relevant markets, i.e., more output.

144.    Valve's conduct has also decreased quality in the market to the detriment of consumers.  Facing no meaningful competition, Valve has little incentive to innovate its platform to offer consumers the highest quality experience and security.  Notably in this regard, with very few employees (roughly 80), and limited reinvestment in security, the Steam platform has undeniable cybersecurity vulnerabilities.  By way of example, in 2011 hackers stole "information about Steam transactions between 2004 and 2008" that contained "names, email addresses, encrypted billing addresses and encrypted credit card information," which forced Valve CEO Gabe Newell to advise Steam Platform users to "watch your credit activity and statements."[70] By 2015, 77,000 Steam user accounts were being "hijacked and pillaged each month."[71] And by 2016, a cottage industry of "Steam Stealer" malware had developed that allowed criminals around the world to defraud Steam users, transforming the Steam Platform "into the devil's playground."[72] In 2019, Valve agreed to fix a "zero-day" security flaw that had potentially exposed tens of millions of Steam users' computers to hackers, but only after Valve had been

---

[70] Gabe Newell, *Message from Gabe to Steam Community*, STEAM (Feb. 10, 2012), https://store.steampowered.com/oldnews/7323.

[71] Steam, *Security and Trading*, (Dec. 9, 2015), https://store.steampowered.com/oldnews/19618.

[72] Santiago Pontiroli & Bart Parys, *Steam Stealers*, KASPERSKY LAB (Mar. 2016), https://media.kasperskycontenthub.com/wp-content/uploads/sites/43/2018/03/07191212/Steam_Stealers_research_ENG.pdf.

CLASS ACTION COMPLAINT - 38
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

publicly pressured to do so.[73] Later than same year, Valve halted trading and selling of digital items for one video game because "nearly all key purchases that end up being traded or sold on the marketplace are believed to be fraud-sourced" by "worldwide fraud networks" engaged in money laundering.[74]

145.    Valve has also explicitly disclaimed responsibility for moderating offensive game content on the Steam Store. In 2018, Valve announced that "we've decided that the right approach is to allow everything onto the Steam Store, except for things that we decide are illegal, or straight up trolling."[75] In 2019, Valve allowed "Rape Day" to be published on the Steam Store, which enabled gamers to "verbally harass, kill, and rape women as you choose to progress the story," and only removed the game after widespread public outcry.[76] The National Center on Sexual Exploitation has regularly denounced Valve, including its ineffective parental controls on the Steam Store.[77]

146.    Valve also harms consumers by incentivizing large publishers not to compete.  In particular, certain large publishers (e.g., Ubisoft among others) have periodically experimented with delisting games from Steam such that they can be offered at discounts to consumers directly (e.g., through their own stores) or through rival platforms offering lower fees.  While beneficial to consumers, this poses a competitive threat to Steam because Steam gets no revenue share for

---

[73] Catalin Cimpanu, *Researcher publishes second Steam zero day after getting banned on Valve's bug bounty program*, ZDNET (Aug. 21, 2019), https://www.zdnet.com/article/researcher-publishes-second-steam-zero-day-after-getting-banned-on-valves-bug-bounty-program/.

[74] Catalin Cimpanu, *Valve says that nearly all CS:GO key resales are being used to launder money*, ZDNET (Oct. 29, 2019), https://www.zdnet.com/article/valve-says-that-nearly-all-csgo-key-resales-are-being-used-to-launder-money/; *see also* Steam, *Security and Trading*, *supra* note 72 ("Account theft has been around since Steam began, but with the introduction of Steam Trading, the problem has increased twenty-fold as the number one complaint from our users.").

[75] Steam, *Who Gets To Be On The Steam Store* (June 6, 2018), https://steamcommunity.com/games/593110/announcements/detail/1666776116200553082.

[76] Patricia Hernandez, *Steam game about raping women will test Valve's hands-off approach*, POLYGON (Mar. 4, 2019), https://www.polygon.com/2019/3/4/18249916/rape-day-steam-valve.

[77] The Nat'l Ctr. on Sexual Exploitation, *Steam "Family View" Safety Features Fail to Protect Kids from Rape Video Games*, NCSE (Feb. 3, 2020), https://endsexualexploitation.org/articles/steam-family-view-safety-features-fail-to-protect-kids-from-rape-video-games/.

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

sales off its platform, and such off-platform sales put downward pressure on the fees Steam can impose.

147.    To disincentivize this type of large publisher competition, Steam adopted in 2018 a set of pricing incentives to keep large publishers' titles on Steam and subject to the PMFN. Under this structure, large publishers pay Valve 25% on Steam sales over $10 million, and 20% on sales above $50 million.  Tellingly, Steam's incentive structure is the inverse of what other platforms offer.  Normally, app distribution platforms offer reduced commissions to *small* developers in recognition of their low margins and to encourage their involvement on the platform.  Both Apple and Google offer a reduced 15% fee tier to small developers with annual revenues below a set threshold.  Tellingly, Steam does the opposite.  It essentially refunds fees only to its largest publishers.

148.    Steam gives its largest publishers a better deal for a reason.  It is because these are the only developers who could conceivably compete with Steam, and Valve's volume discounts discourage them from doing so.  As Steam's own announcement of this pricing scheme stated, the goal of the incentives was to reward "developers of big games" by "aligning their interests with Steam."[78]  The reduced commissions have provided large publishers with millions of dollars in additional revenue, mitigating incentivizes they may otherwise have to compete with Steam by self-distributing or distributing exclusively through non-Steam channels.

149.    In addition to increasing prices, while reducing output and innovation, Valve has maintained its monopoly and engaged in other anticompetitive practices that impose unique harms on consumers.  Two examples are (1) Valve's use of Steam Keys and (2) and Valve's efforts to coordinate game pricing.

**A.    Valve uses Steam Keys to protect its monopoly and overcharge consumers.**

150.    When the Steam Store launched, PC games were still commonly distributed via compact discs ("CDs"). The consumer would purchase a CD and install the PC game on their PC

---

[78] Steamworks Press Release, *New Revenue Share Tiers and other updates to the Steam Distribution Agreement*  (Nov. 30, 2018), https://steamcommunity.com/groups/steamworks/announcements/detail/1697191267930157838.


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

computer.  Publishing games on CDs is not particularly expensive for game developers, costing less than a dollar and far less than Steam's 30% commission.  Game developers' ability to self-publish and distribute games via CD was thus a competitive threat to the Steam Store.

151.    In a competitive market, the savings from CD-based distribution would be reflected in the retail prices consumers pay, incentivizing consumers to move purchases away from high commission stores like Steam. Moreover, as consumers grew accustomed to making physical purchases online through eCommerce retailers like Amazon, the competition from this alternative PC games sales model would only have increased.

152.    Valve mitigated this threat through the use of Steam Keys.

153.    Steam Keys are codes issued by Valve that users can activate to play a PC game on the Steam Gaming Platform.  Steam Keys are similar to a gift card or a voucher designed for use on a website. Whether the code is physically printed on a card and packaged in a game box, or contained in a digital message like an email, the consumer uses the code on Steam to obtain the product associated with the code.  Valve provides publishers with a limited number of Steam Keys and has discretion to meter their use, including by voiding them after issuance.

154.    To ward off competitive threats from alternative distribution modes, Steam made Steam Keys conditionally available to publishers for free (i.e., no 30% or other Valve commission), albeit in limited numbers, so long as the publishers agreed not to pass through cost savings to consumers.  This model has significant anticompetitive effects, particularly on consumers.

155.    *First*, while developers benefit from higher margins on sales made with Steam Keys (because Valve does not charge any commission), publishers can distribute with Steam Keys only on the condition that they abide by Valve's PMFN and not discount prices to consumers.  As addressed above, Valve is explicit in its requirement that Steam Keys be sold for the same (or higher) price as the Steam Store. Game publishers must specifically agree to "sell your game on other stores in a similar way to how you sell your game on Steam. <u>It is important that you don't give Steam customers a worse deal than Steam Key purchasers.</u>" (emphasis original)

CLASS ACTION COMPLAINT - 41
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

156.     This PMFN clause directly inhibits price competition and prevents consumers from receiving discounts game developers would otherwise be incentivized to provide when selling 0% commission Steam Keys.

157.     **Second**, Steam uses Steam Keys to protect its monopoly.  One way a gaming platform can expose consumers to its digital platform is by selling digital codes for games (such as Steam Keys) through physical retail outlets.  In this way, digital codes like Steam Keys provide an access point into a platform, particularly for conventional shoppers accustomed to buying boxed games (or gifting boxed games) from physical retailers.

158.     For example, if a parent shopping at Walmart were to buy his or her child an Epic Games Store game key, that child is likely to enter the Epic Games Store ecosystem and become invested in that platform.  That is a customer Steam would have to win back.

159.     By giving its Steam Keys to publishers for free—i.e., at a loss—Valve has ensured that this type of competition in the distribution of physical game keys does not meaningfully evolve.  Given the option to distribute through their games through free Steam Keys, developers have minimized incentivize to physically distribute game codes offered by any competing platform.

160.     By ensuring that the physical code distribution channel is entirely dominated by Steam Keys that Valve dumps below cost, Valve prevents potential competitors from reaching new customers by profitably selling their own physically printed digital codes.

**B.     Valve advises publishers not to engage in price competition and facilitates price coordination.**

161.     Because Valve extracts 30% from sales on Steam, Valve does not stand to benefit from vigorous price competition on its platform.  If Steam publishers actively seek to undercut each other's prices for competing game titles and in-game products, that drives total sales revenues down and, with it, Valve's commission revenue.  Thus, while consumers benefit from active price competition among publishers, Valve wants prices on its platform to remain high, particularly because, with the PMFN, high prices on Steam must be matched elsewhere, leaving consumers no cheaper distribution channel into which they could divert sales.

CLASS ACTION COMPLAINT - 42
Case No. 2:24-cv-01218
011258-11/2686081 V1

**HAGENS BERMAN**
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

162.     It is similarly profitable for game publishers to avoid vigorous price competition with one another.  While the sheer number of publishers on Steam should make price coordination difficult, Valve provides price "recommendations" and guidance that serve this function.  In particular, any time a publisher sets or adjusts a price for a game or in-game product offered through Steam, it must submit the "proposed" price to Valve for approval.  Valve's guidance specifically states that, upon receipt of a proposed price, Valve will not approve any price less than $0.99 and will "recommend pricing strategies based on our experience and may suggest prices based on currency conversions and other factors."[79]

163.     In proposing a price, publishers are instructed by Valve to evaluate "[h]ow are games of a similar nature priced?" and that setting prices is "*not about trying to undercut competition with a lower price*."[80]

164.     Not only are publishers cautioned by Valve not to "undercut competition," they know when receiving a "recommended" price from Valve that their competitors are also receiving the same recommendations.  Publishers are thus strongly incentivized to accept Valve's recommended prices.

165.     Publishers are also prohibited from changing their prices within 30 days of a game's release, which further undermines competition and facilitates interdependent pricing by game publishers.  This "post and adhere" pricing system gives game publishers visibility into competitor pricing *with* assurance that the prices for new releases (which are often the most popular titles on the Steam Store) will remain stable for a substantial period.  This prevents competitive price adjustments and has the effect of coordinating prices across Steam's platform.  The anticompetitive effects of this type of "post and adhere" pricing are well-recognized by leading antitrust authorities.  *See* Areeda & Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2024 ("Agreements to post [prices] *and adhere* are inherently dangerous and should be regarded as illegal per se.").

---

[79] *See* Steamworks Documentation*, Pricing*, available at: https://partner.steamgames.com/doc/store/pricing.

[80] *Id.* (emphasis added).

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

166.    Using the above tools, Valve is able to coordinate prices within a supracompetitive range it considers profitable.  In a market operating without Valve's pricing guidance, "recommendations," and "post and adhere" pricing system, competition on price would be more active across Steam and consumers would pay less for both PC games and PC in-game content.

## XI.    CLASS ACTION ALLEGATIONS

167.    Plaintiffs bring this action on behalf of themselves and, under Federal Rules of Civil Procedure 23(a), (b)(2), and (b)(3), as representatives of a Class defined as follows:

> All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in the United States and its territories. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

168.    The proposed Class can also be broken out into the following California subclass:

> All persons and entities who, directly or through an agent, purchased a PC game on the Steam Store, or purchased an in-game product from a game distributed on the Steam Store, in California. Excluded from the Class are Defendant and its employees, parents, and subsidiaries.

169.    When a gamer makes a purchase through the Steam Store, the gamer buys the game from Valve, paying the full retail price to Valve directly. There is no intermediary in the distribution chain between Valve and the consumer. Similarly, when a gamer uses a Steam Wallet to make an in-app purchase, that gamer pays Valve to complete the transaction.  Gamers are the immediate buyers from Valve, the Defendant in this antitrust case, and pay overcharges caused by inflated commissions directly to Valve.

170.    **Numerosity.** Members of the Class (and Sub-Class) are so numerous that joinder is impracticable. Plaintiffs do not know the exact size of the Class (and Sub-Class) but believe that there are at least millions of class members geographically dispersed throughout the United States.

171.    **Typicality.** Plaintiffs' claims are typical of the claims of the members of the Class (and Sub-Class). Plaintiffs and all members of the Class (and Sub-Class) were damaged by the

CLASS ACTION COMPLAINT - 44
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

same wrongful conduct of Valve. Specifically, Valve's wrongdoing caused class members to pay inflated prices to Valve.

172.   **Adequacy of Representation.** Plaintiffs are represented by counsel who are experienced and competent in the prosecution of class action antitrust litigation. Plaintiffs and their counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiffs' counsel have no interests that are adverse to, conflict with, or are antagonistic to the interests of the Class (or Sub-Class).

173.   Plaintiffs themselves will fairly and adequately protect and represent the interests of the Class (and Sub-Class).  The interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class (and Sub-Class). Accordingly, by proving their own claims, Plaintiffs will prove other class members' claims as well.

174.   There is an alignment of interests, and no conflict of interest. All class members would benefit from robust competition in the relevant markets, and from reforming Valve's illegal practices through injunctive relief.

175.   **Commonality.** There are many questions of law and fact common to the Class (and Sub-Class), including, but not limited to:

whether there exists a relevant market for PC Game Distribution;

whether there exists a relevant market for PC In-Game Payment Processing;

whether Valve possesses monopoly power in these relevant markets;

whether Valve secured or has maintained monopoly power through anticompetitive means;

whether Valve has unlawfully tied PC In-Game Payment Processing to PC Game Distribution;

whether Valve's conduct has led to supracompetitive prices, reduced output, and/or reduced quality in the relevant markets; and,

whether consumers have been harmed by Valve's conduct and in what amount.

176.   The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendant.

CLASS ACTION COMPLAINT - 45
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

177.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members is not only impracticable, but impossible. The damages suffered by many Class members are small in relation to the expense and burden of individual litigation, and therefore, it is highly impracticable for such Class members to individually attempt to redress the wrongful anticompetitive conduct alleged herein.

## XII.    INTERSTATE TRADE AND COMMERCE

178.    Valve's conduct has taken place in and affected the continuous flow of interstate trade and commerce of the United States, in that, inter alia: Valve has provided PC Game Distribution and PC In-Game Payment Processing throughout the United States; Valve has used instrumentalities of interstate commerce to provide PC Game Distribution and PC In-Game Payment Processing throughout the United States; in furtherance of the anticompetitive scheme alleged herein, Valve employees have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail; and the anticompetitive scheme alleged herein has affected billions of dollars of commerce.

179.    Valve has inflicted antitrust injury by causing gamers to pay supracompetitive prices and to experience reduced output and quality in the relevant market.

## XIII.    FRAUDULENT CONCEALMENT

180.    Valve has taken affirmative steps to mislead Plaintiffs and the world about the existence of the PMFN, including in litigation filings.  In their publicly filed Answers in the *Wolfire* litigation (*Wolfire Games, LLC v. Valve Corp.*, No. 21-cv-0563 (W.D. Wash.)), Valve flatly denied that "it maintains or enforces a PMFN." At the motion to dismiss stage, Valve likewise represented that "No one has ever seen this shadow policy. . . . In short, Wolfire's claims regarding this alleged [PMFN] policy are thoroughly fanciful."

181.    Even in Valve's recent public filings opposing class certification, Valve continues to affirmatively represent that it has no PMFN.  It claims that "Plaintiffs' broad content parity component does not exist" and the "price parity component of the alleged PMFN is a fantasy."

182.    As explained above, however, these representations are false.  Yet by fraudulently and continuously denying the existence of the PMFN, Valve deterred Plaintiffs and members of



the proposed class from investigating and asserting their claims. Moreover, as set forth above, the PMFN is imposed on game publishers through private communications and through a combination of written and unwritten rules, to which consumers are not privy. Once Plaintiffs had information sufficient to suspect the existence of Valve's anticompetitive practice, they acted diligently to investigate and prosecute their claims.

183. Valve's fraudulent concealment of the PMFN policy tolled the limitations period with respect to all claims asserted in this Complaint.

## XIV. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET**
**(15 U.S.C. § 2)**

184. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

185. Valve has willfully acquired and maintained monopoly power in the relevant market for PC Game Distribution, by means of exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

186. Through its PMFN, Valve has caused publishers to offer their games at the same price across the PC Game Distribution market, regardless of whether competing platforms charge a lower commission or otherwise charge lower prices than Valve.

187. Valve's PMFN has impeded competitors' ability to attract more publishers and gamers to their PC Game Distribution platforms.

188. In the absence of Valve's PMFN, rivals in the PC Game Distribution market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Distribution platform, the Steam Store, benefitting consumers that utilized Valve's PC Game Distribution platform.

189. Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant market more efficient.

CLASS ACTION COMPLAINT - 47
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

190. Valve's conduct has had a substantial effect on interstate commerce.

191. Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

192. Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## SECOND CAUSE OF ACTION

### SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC GAME DISTRIBUTION MARKET (15 U.S.C. § 2)

193. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

194. In the relevant market for PC Game Distribution, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

195. Valve's conduct has had an anticompetitive effect in the relevant market for PC Game Distribution.

196. Valve's conduct has no legitimate business purpose or procompetitive effect.

197. Valve has engaged in that conduct with the specific intent of monopolizing the relevant market for PC Game Distribution.

198. Valve has engaged in that conduct with a dangerous probability of monopolizing the relevant market for PC Game Distribution.

199. In the absence of the Valve PMFN, rivals in the PC Game Distribution platform market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC Game Distribution platform, the Steam Store, benefitting consumers that utilized Valve's PC Game Distribution platform.

200. Valve's conduct has had a substantial effect on interstate commerce.

CLASS ACTION COMPLAINT - 48
Case No. 2:24-cv-01218
011258-11/2686081 V1



201.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

202.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## THIRD CAUSE OF ACTION

### SHERMAN ACT SECTION 2—MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET
### (15 U.S.C. § 2)

203.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

204.    Valve has willfully acquired and maintained monopoly power in the relevant market for PC In-Game Payment Processing by means of exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, tying, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

205.    Through the Valve PMFN, Valve has caused publishers to offer their games and in-game products at the same price across all PC game platforms, regardless of whether competing platforms charge a lower commission or otherwise charge lower prices than Valve.

206.    Valve's threats and coercion have impeded competitors' ability to attract more publishers and gamers to their platforms where they can provide PC In-Game Payment Processing.

207.    Valve has further willfully acquired and maintained monopoly power in the PC In-Game Payment Processing market by requiring that consumers use a Steam Wallet to make in-game purchases within games distributed through the Steam Store, foreclosing consumers from using, and publishers from providing, alternative options for PC In-Game Payment Processing.

208.    In addition to fostering and cementing Valve's monopoly in the PC In-Game Payment Processing market, Valve's prohibition on rival payment processing solutions and

CLASS ACTION COMPLAINT - 49
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

requirement that consumers use, and publishers offer, PC In-Game Payment Processing solutions offered by Valve constitutes an unlawful tie.

209.    In the absence of the Valve PMFN and Valve's tying conduct, rivals in the PC In-Game Payment Processing Market would charge lower prices and force Valve to compete. Such competition would in turn lower prices for Valve's own PC In-Game Payment Processing, benefitting consumers that utilized this service for in-game purchases.

210.    Valve's conduct is not justified, because its conduct does not enhance overall efficiency or make the relevant market more efficient.

211.    Valve's conduct has had a substantial effect on interstate commerce.

212.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

213.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## FOURTH CAUSE OF ACTION

### SHERMAN ACT SECTION 2—ATTEMPTED MONOPOLIZATION OF THE PC IN-GAME PAYMENT PROCESSING MARKET (15 U.S.C. § 2)

214.    The foregoing paragraphs are incorporated by reference as though fully set forth herein.

215.    In the relevant market for PC In-Game Payment Processing, Valve has engaged in exclusionary and anticompetitive conduct, including but not limited to market-wide price controls, tying, coercion of disloyal publishers, and blocking competitive strategies, as alleged herein.

216.    Valve's conduct has had an anticompetitive effect in the relevant market for PC In-Game Payment Processing.

217.    Valve's conduct has no legitimate business purpose or procompetitive effect.

CLASS ACTION COMPLAINT - 50
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

218. Valve has engaged in that conduct with the specific intent of monopolizing the relevant market for PC In-Game Payment Processing.

219. Valve has engaged in that conduct with a dangerous probability of monopolizing the relevant market for PC In-Game Payment Processing.

220. In the absence of the Valve PMFN and Valve's tying conduct, rivals in the PC In-Game Payment Processing Market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC In-Game Payment Processing, benefitting consumers that utilized this service.

221. Valve's conduct has had a substantial effect on interstate commerce.

222. Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

223. Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## FIFTH CAUSE OF ACTION

### SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS ON TRADE THROUGH PUBLISHERS (15 U.S.C. § 1)

224. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

225. As alleged above, Valve and the various publishers have enter into one or more contracts, combinations, or conspiracies to unreasonably restrain trade, to control prices or exclude competition, and to willfully acquire and maintain market power in the relevant market for PC Game Distribution and PC In-Game Payment Processing.

226. Through a combination in restraint of trade, Valve and the various publishers agree that, as a condition of distributing games and in-game content through the Steam Store, the publishers will not offer lower prices or enhanced content for any games or in-game products offered through other distribution channels.  Valve and the various publishers further combine in

CLASS ACTION COMPLAINT - 51
Case No. 2:24-cv-01218
011258-11/2686081 V1


HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

restraint of trade to coordinate pricing through Valve's pricing guidance, pricing "recommendations," and "post and adhere" pricing system.

227. Valve's conduct has had an anticompetitive effect in the relevant markets for PC Game Distribution and PC In-Game Payment Processing.

228. Valve's conduct, in combination with publishers, has no legitimate business purpose or procompetitive effect.

229. There are less restrictive alternatives to the PMFN and other restraints has Valve imposed through agreements with game publishers.

230. Valve's conduct has had a substantial effect on interstate commerce.

231. Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

232. Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.

## SIXTH CAUSE OF ACTION

### SHERMAN ACT SECTION 1—UNREASONABLE RESTRAINTS ON TRADE BY TYING CONDUCT (15 U.S.C. § 1)

233. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

234. As alleged above, through its agreements and guidelines with game publishers, Valve has unlawfully tied PC In-Game Payment Processing to PC Game Distribution.

235. Through its tying conduct, Valve requires that consumers use a Steam Wallet to make in-game purchases within games distributed through the Steam Store, foreclosing consumers from using, and publishers from providing, alternative options for PC In-Game Payment Processing.

236. PC In-Game Payment Processing and PC Game Distribution are separate products for which there is separate demand. On other gaming platforms, and in other markets unaffected

CLASS ACTION COMPLAINT - 52
Case No. 2:24-cv-01218
011258-11/2686081 V1

HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE    (206) 623-0594 FAX

by Valve's tie, consumers can (and do) purchase PC Game Distribution service without also obtaining PC In-Game Payment Processing from the same provider.  Likewise, consumers can purchase PC In-Game Payment Processing without obtaining PC Game Distribution from the same provider.

237.    In a competitive market without Valve's tie, publishers would be able to provision, and consumers would be able to select among, a range of PC In-Game Payment Processing services to process in-game transactions within games acquired from Steam.  This would inject competition into the PC In-Game Payment Processing and prevent Valve from imposing supracompetitive 30% commission on in-game purchases.

238.    In the absence of the Valve PMFN and Valve's tying conduct, rivals in the PC In-Game Payment Processing Market would charge lower prices and force Valve to compete. Such competition would in turn lower prices on Valve's own PC In-Game Payment Processing, benefitting consumers that utilized this service.

239.    Valve has substantial market power—indeed, a monopoly—in the tying product market for PC Game Distribution.

240.    Valve's tie affects a substantial volume of commerce, likely billions annually.

241.    Valve's tying conduct has no legitimate business purpose or procompetitive effect.

242.    There are less restrictive alternatives to the restraints Valve imposed.

243.    Valve's conduct has had a substantial effect on interstate commerce.

244.    Plaintiffs and all those in the Class have been or will be injured in their property as a result of Valve's conduct.

245.    Plaintiffs and all those in the Class have suffered and will suffer injury of the type that the antitrust laws were intended to prevent. Plaintiffs have been and will be injured by the harm to competition as a result of Valve's conduct.



## SEVENTH CAUSE OF ACTION

### Washington State Consumer Protection Act, RCW 19.86
### (Nationwide Class)

246. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

247. The claims alleged above constitute unfair methods of competition under Washington State law provisions RCW 19.86.020, 19.86.040, and 19.86.030.

248. Valve is engaged in unfair and deceptive practices in commerce, which affect the public interest and cause injury to business and property.

249. Valve's contracts, combinations, or conspiracies with game publishers are anticompetitive restraints that have the purpose and effect of fixing and inflating prices in the relevant market.

250. The contracts, combinations, or conspiracies at issue are in restraint of trade.

251. Valve's monopolization and attempted monopolization have the purpose and effect of fixing and inflating prices in the relevant market.

252. As such, class members are entitled to damages and an injunction under Revised Code of Washington 19.86.090.

## EIGHTH CAUSE OF ACTION

### California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code Section 17200 et seq.
### (California Subclass)

253. The foregoing paragraphs are incorporated by reference as though fully set forth herein.

254. The UCL defines unfair competition to include any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with § 17500) of Part 3 of Division 7 of the Business and Professions Code." *See* Cal. Bus. & Prof. Code § 17200.

CLASS ACTION COMPLAINT - 54
Case No. 2:24-cv-01218
011258-11/2686081 V1



1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

255.  Valve violated the UCL by engaging in unlawful, unfair, and deceptive business acts and practices, as alleged herein.  Plaintiffs were injured as a result of Valve's UCL violations, including through overcharges incurred in the purchase of PC games and in-game products.

256.  Valve is a "person" as defined by Cal. Bus. & Prof. Code § 17201.

257.  California law and the UCL apply to the claims of the California Subclass because California has an overriding interest in ensuring that its residents are permitted to assert claims for public injunctive relief under the UCL and otherwise.

258.  Plaintiffs seek public injunctive relief under the UCL, including a permanent injunction preventing Valve from using the PFMN, tying arrangements, and other anticompetitive practices to maintain monopolies in the PC Game Distribution Market and the PC In-Game Payment Processing Market.  Such injunctive relief would inject competition into these markets to the benefit of the public at large, including future purchasers of PC games and in-game content.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request the following relief:

A.  Injunctive relief benefiting the class and the public, including a permanent injunction barring Valve's unlawful restraints;

B.  Damages in an amount to be determined;

C.  Restitution;

D.  Treble damages;

E.  Attorneys' fees;

F.  Costs;

G.  Pre-judgment and post-judgment interest at the maximum rate permitted under the law;

H.  Punitive damages; and

CLASS ACTION COMPLAINT - 55
Case No. 2:24-cv-01218
011258-11/2686081 V1



HAGENS BERMAN
1301 Second Avenue, Suite 2000, Seattle, WA 98101
(206) 623-7292 OFFICE     (206) 623-0594 FAX

I.       Declaratory relief, including but not limited to a declaration and judgment that Valve's conduct alleged in the Complaint violates the laws alleged in the Complaint; and such other and further relief as the Court deems proper and just.

**JURY DEMAND**

Plaintiffs, on behalf of themselves and the proposed Class, demand a trial by jury on all issues so triable.

DATED:  August 9, 2024                Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

/s/ *Steve W. Berman*
Steve W. Berman (WSBA No. 12536)

/s/ *Xiaoyi Fan*
Xiaoyi Fan (WSBA No. 56703)
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
E-mail:  steve@hbsslaw.com
E-mail:  kellyf@hbsslaw.com


Ben M. Harrington (*pro hac vice* forthcoming)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 300
Berkeley, CA  94710
Telephone: (510) 725-3034
Facsimile: (510) 725-3001 fax
E-mail:  benh@hbsslaw.com


William Ward Bucher IV  (*pro hac vice* forthcoming)
BUCHER LAW PLLC
350 Northern Blvd, Ste. 324 -1519
Albany, NY 12204-1000
Telephone: (202) 997-3029
Email: will@bucherlawfirm.com

*Attorneys for Plaintiffs*

CLASS ACTION COMPLAINT - 56
Case No. 2:24-cv-01218
011258-11/2686081 V1



# EXHIBIT 21

FILED
2025 FEB 24 09:00 AM
KING COUNTY
SUPERIOR COURT CLERK
E-FILED
CASE #: 25-2-06159-1 SEA

SUPERIOR COURT OF THE STATE OF WASHINGTON
IN AND FOR KING COUNTY

VALVE CORPORATION,

                Petitioner,

    v.

ALFREDO GONZALEZ,

                Respondent.

No. _____

**VALVE CORPORATION'S PETITION TO CONFIRM ARBITRATION AWARD PURSUANT TO RCW 7.04A.220 AND FOR A JUDGMENT PURSUANT TO RCW 7.04A.250**

Valve Corporation ("Valve") requests an order pursuant to RCW 7.04A.220 confirming the Award of Arbitrator issued by American Arbitration Association ("AAA") Arbitrator Michael F. Saydah in Valve's favor, dated January 7, 2025 (the "Final Award," as corrected, the "Final Corrected Award"),[1] in the matter *Gonzalez v. Valve Corporation dba Steam*, AAA Case No. 01-23-0005-3839 (the "Arbitration").[2] Valve also requests that the Court enter judgment in accordance with the Final Award pursuant to RCW 7.04A.250.

---

[1] Valve has concurrently filed a motion to seal the Final Award to request limited redactions of confidential information. The Final Award will be attached as Exhibit 1 to the Declaration of Blake Marks-Dias filed herewith, dated February 24, 2025 ("Decl." and exhibits thereto "Ex."). Until the motion to seal is resolved, this exhibit will be a placeholder slipsheet in the public docket.

[2] Valve will be filing a motion to consolidate this Petition with petitions to confirm arbitration awards in 22 similar arbitrations presided over by the same arbitrator. Consolidation will streamline the proceedings and avoid unnecessary cost or delay because the awards are in all material respects identical and the petitions request the same relief.

VALVE CORPORATION'S
PETITION TO CONFIRM
ARBITRATION AWARD – 1

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## I.    **STATEMENT OF FACTS**

Valve is a corporation organized under the laws of Washington State with its principal place of business in King County, Washington. (Decl. ¶ 2.)

On October 2, 2023, Respondent Alfredo Gonzalez ("Respondent") filed a demand for arbitration against Valve with the AAA alleging anticompetitive practices regarding prices on Valve's digital gaming platform, Steam. (Ex. 1 at 7-8.) Respondent asserted claims under Sections 1 and 2 of the Sherman Act, the Washington Consumer Protection Act, and California Unfair Competition Law. (*Id.* at 7-8.) Respondent also asserted a claim for breach of contract based on the allegation that Valve did not satisfy an alleged contractual obligation to pay arbitration fees. (*Id.* at 8.)

While the parties disputed whether Respondent could proceed in arbitration, the arbitrator permitted the Arbitration to proceed.[3] (Decl. ¶ 4.)

Following a multi-day arbitration hearing, on January 7, 2025, Arbitrator Saydah issued the Final Award in the Arbitration. (Decl. ¶ 5.)

On January 8, 2025, the AAA transmitted the Final Award to the parties. (Decl. ¶ 6.)

On February 17, 2025, the arbitrator issued an Award Modification, correcting a typographic error in the Final Award, thus creating the Final Corrected Award. (Decl. ¶ 8; Ex. 2.)

On February 18, 2025, the AAA transmitted the Award Modification to the parties. (Decl. ¶ 9.)

---

[3] On October 18, 2024, Valve filed a Petition to Enjoin Arbitrations in an action in the Western District of Washington captioned *Valve Corporation v. Abbruzzese*, 2:24-cv-01717 (the "Petition"). The Petition seeks to enjoin arbitrations brought by Respondent and 623 other claimants represented by the same counsel against Valve. The relief sought in the Petition as to Respondent is now moot.

VALVE CORPORATION'S
PETITION TO CONFIRM
ARBITRATION AWARD – 2

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

The arbitrator found in the Final Corrected Award that (i) "there is no antitrust violation under either Section 1 or Section 2 of the Sherman Antitrust Act" and (ii) "there is no violation under the California Unfair Competition Law, nor is there a violation under the Washington State Unfair Competition Law." (Ex. 1 at 27.) Consequently, Respondent is "not entitled to recover any antitrust violation damages or unfair competition damages." (*Id.*) The arbitrator further found that Valve did not breach its contractual obligations to Respondent. (*Id.* at 28.)

The final binding award was as follows:

> Claimant [Respondent here] takes nothing for the alleged Sherman Act violations, takes nothing for the alleged Unfair Competition Law violations under California State Law and Washington State Law and take nothing for the alleged breach of the funding requirements of the arbitration agreement under the breach of contract theory.

> Lastly, any breach of warranty claim for damage to computer hardware caused by a game is denied pursuant to the Limitation of Liability paragraph in the SSA.[4]

> All issues submitted for decision have been decided. This Binding Award is in full settlement of all claims and counterclaims submitted to this Arbitration.

(Ex. 1 at 29.)[5]

---

[4] "SSA" is defined as the Steam Subscriber Agreement in place "at the time [Respondent] signed up on Steam's platform." (Ex. 1 at 2.)

[5] Although not relevant to the merits of the arbitrator's decision, the Final Corrected Award incorrectly states that Valve agreed the relevant product market was PC games and the relevant geographic market was the United States. Those were assertions made by Respondent, not Valve, and Valve disputed Respondent's proposed product and geographic market definitions, as shown by the testimony and evidence presented at the hearing. The Final Corrected Award also incorrectly states that Valve's expert offered a calculation of Valve's market share; in fact, Valve's expert testified only about what market share would be if Respondents' proposed product market (PC games) definition were accepted and the geographic market were worldwide.

VALVE CORPORATION'S
PETITION TO CONFIRM
ARBITRATION AWARD – 3

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## II.    STATEMENT OF ISSUES

Whether the Court should enter an order confirming Arbitrator Saydah's Final Corrected Award and enter judgment in accordance with the Final Corrected Award.

## III.    EVIDENCE RELIED UPON

This petition is based upon the Declaration of Blake Marks-Dias, dated February 24, 2025, along with the exhibits thereto.

## IV.    ARGUMENT AND LEGAL AUTHORITY

### A.    The Final Corrected Award Should Be Confirmed Under RCW 7.04A.220

The Final Corrected Award should be confirmed. Under the Washington Uniform Arbitration Act, "[a]fter a party to [an] arbitration proceeding receives notice of an award, the party may file a motion with the court for an order confirming the award." RCW 7.04A.220. "[T]he court shall issue such an order unless the award is modified or corrected under RCW 7.04A.200 or 7.04A.240 or is vacated under RCW 7.04A.230." *Id.*

On January 8, 2025, Valve and Respondent received notice of the Final Award, and on February 18, 2025, Valve and Respondent received notice of the Award Modification. (Decl. ¶¶ 6, 9.) The Final Corrected Award has not been modified under RCW 7.04A.200 or 7.04A.240 or vacated under RCW 7.04A.230. (Decl. ¶ 11.) Accordingly, Valve is entitled to entry of an order confirming the Final Corrected Award.

### B.    Valve Is Entitled to a Judgment in Conformity with the Final Corrected Award

Valve is entitled to a judgment in accordance with the Final Corrected Award. Upon granting an order confirming an award, the Court "shall enter a judgment in conformity with the order." RCW 7.04A.250. The court has "a mere ministerial duty to reduce the award to judgment," *Price v. Farmers Ins. Co. of Wash.*, 133 Wn. 2d 490, 497 (1997), and cannot "go behind the face of the award," *id.* at 496-97.

VALVE CORPORATION'S
PETITION TO CONFIRM
ARBITRATION AWARD – 4

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## V.     <u>CONCLUSION</u>

For the foregoing reasons, Valve respectfully requests that the Court grant this Petition to confirm the Final Corrected Award and enter judgment in conformity therewith.

DATED: February 24, 2025

I certify that this memorandum contains 802 words, in compliance with the Local Civil Rules.

CORR CRONIN LLP

s/ Blake Marks-Dias
Blake Marks-Dias, WSBA No. 28169
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com

*Of Counsel*

Michael W. McTigue Jr.
Meredith C. Slawe
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
michael.mctigue@skadden.com
meredith.slawe@skadden.com

*Attorneys for Petitioner Valve Corporation*

VALVE CORPORATION'S
PETITION TO CONFIRM
ARBITRATION AWARD – 5

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

### CERTIFICATE OF SERVICE

I hereby certify that on the below date, I caused a true and correct copy of the foregoing document to be served on the parties listed below via electronic mail:

William Bucher
Bucher Law PLLC
Counsel for Respondent: Alfredo Gonzalez
will@bucherlawfirm.com
202-997-3029
350 Northern Blvd
STE 324 -1519
Albany, NY 12204-1000


DATED February 24, 2025 at Seattle, Washington.


_s/ Melinda R. Sullivan_____
Melinda R. Sullivan, Legal Assistant
Corr Cronin LLP
1015 Second Avenue, 10th Floor
Seattle, WA 98104
Phone: (206) 625-8600
Email: msullivan@corrcronin.com

VALVE CORPORATION'S
PETITION TO CONFIRM
ARBITRATION AWARD – 6

**Corr Cronin LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

# EXHIBIT 22

The Honorable Jamal N. Whitehead

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE VALVE ANTITRUST LITIGATION

No. 2:21-CV-00563-JNW

**DEFENDANT VALVE CORPORATION'S OPPOSITION TO PLAINTIFF RYAN LALLY'S MOTION FOR SANCTIONS**

NOTE ON MOTION CALENDAR:
JULY 2, 2025

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## **TABLE OF CONTENTS**

**Page**

I.    PRELIMINARY STATEMENT ..................................................................................1

II.   FACTUAL BACKGROUND ....................................................................................2

      A.    Lally and Six Other Consumers Sued Valve; Judge Coughenour Compelled Those Plaintiffs to Arbitrate ..................................................2

      B.    Two Years Later, Lally's Counsel Brought a Mass Arbitration Against Valve That Included Lally's Demand ...........................................3

      C.    An Arbitrator Ruled That Valve's Arbitration Provision Was Unenforceable .................................................................................3

      D.    Valve Removed the Arbitration Provision; All Consumer Plaintiffs Except Lally Moved to Lift the Stay ..................................................3

      E.    The AAA Invoiced Valve $20.8 Million for the 14,911 Arbitration Demands Brought by Lally's Counsel; Valve Declined to Pay Those Fees and the AAA Suspended the Arbitrations ..................................................4

      F.    Lally Apparently Quit Using Steam Before the SSA Was Amended and Did Not Agree to the Current SSA ...........................................5

III.   ARGUMENT .............................................................................................................5

      A.    Lally Is Entitled to No Relief Personally and Has No Standing to Seek Relief on Behalf of 14,910 Other People ..................................................5

          1.    Lally Is Not Entitled to Relief Because Valve Has Agreed to Arbitrate His Individual Claim      6

          2.    Lally Has No Standing to Seek Relief on Behalf of 14,910 Other People      7

      B.    The 14,910 Strangers to This Action Have No Right to Arbitrate .........................8

      C.    Valve's Refusal to Pay $20.8 Million in Fees Did Not Violate Judge Coughenour's Order Compelling Arbitration ..........................................10

      D.    Valve's Update to the Steam Subscriber Agreement Is Not Sanctionable ............11

      E.    Valve Has Not Violated Rule 11 ...........................................................11

      F.    Valve Has Not Committed Criminal Contempt ..........................................12

IV.   CONCLUSION .........................................................................................................12

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – i
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

## I.   PRELIMINARY STATEMENT

Plaintiff Ryan Lally has no basis to seek sanctions on his own behalf and no standing to seek relief on behalf of 14,910 other strangers to this action. His motion for sanctions should be denied.

**Lally Has No Grounds To Seek Relief on His Own Behalf.** Lally moves for relief on his own behalf on the purported ground that Valve has refused to arbitrate with him. Valve has not refused to arbitrate—this disguised motion to compel arbitration has no merit. Valve has expressly agreed to proceed with Lally's arbitration before the American Arbitration Association ("AAA"). Valve asked the AAA to issue an invoice for Lally's individual case and committed to pay the invoice promptly upon receipt.[1] But Lally's counsel told the AAA "Valve's request for AAA to reissue an invoice for Claimant Ryan Lally should be denied." The AAA acquiesced and declined to issue the invoice. Lally has an arbitration pending before the AAA, and Lally may proceed with his case at any time. Accordingly, Lally has no basis to seek relief on his own behalf.

Lally's newfound insistence on arbitration also comes as a surprise to Valve because it is contrary to the positions Lally took in this Court. In 2021, after Valve moved to compel Lally's claim to arbitration under the Superseded SSA, Lally and his six consumer co-plaintiffs argued that Valve's now-superseded arbitration agreement was unconscionable, unenforceable, and "would deny" them "the ability to seek and obtain the statutory relief available to [them]." In granting Valve's motion, Judge Coughenour ruled that the arguments on enforceability could only be decided in arbitration. In 2024, an arbitrator in four other arbitrations (not involving Lally) held that the arbitration agreement was unenforceable. On August 9, 2024, those four individuals filed a putative class action in this Court asserting antitrust claims on behalf of a nationwide class—including Lally—in a complaint that was a near carbon-copy of Lally's complaint in this action.

---

[1] Valve agreed to arbitrate because Lally's facts are unusual: based on Valve's records, it does not appear that Lally accepted Valve's current Steam Subscriber Agreement which requires all claims—including accrued and pending claims—to proceed in court. Valve's now-superseded Steam Subscriber Agreement (the "Superseded SSA") contained an arbitration agreement.

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 1
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

They argued that they had "won binding decisions from arbitrators rendering Valve's arbitration provision unenforceable." Valve then removed from the Steam Subscriber Agreement the arbitration agreement deemed unenforceable. Lally's six consumer co-plaintiffs then requested that this Court lift the stay as to them so they could proceed with their putative class action. Yet Lally, without explanation, changed course. He apparently decided he did **not** want to proceed in Court, so the Court left the stay in place as to him. And Lally has now repudiated the positions he took in his 2021 filings, including that his putative class action was "superior to any other method for the fair and efficient adjudication of this legal dispute." (ECF 34 ¶314.)

**Lally Has No Basis To Seek Relief on Behalf of Thousands of Strangers.** This motion is a gambit by Lally's counsel, Mason LLP, to force Valve to pay $20.8 million in arbitration fees for 14,910 arbitration claimants who are not parties to this action. This attempt should fail for numerous reasons. First, Lally has no standing to seek relief as to these claimants, which should end the inquiry. Beyond that, (i) Lally has not shown that any of these claimants has an arbitration agreement with Valve; (ii) Lally has not pointed to any case that held a party's refusal to pay arbitration fees (particularly those of non-parties) is sanctionable; and (iii) the very arbitration agreement Lally seeks to enforce expressly forecloses any "representative" action or request for representative or relief—precisely what Lally seeks here.

For the foregoing reasons, the Court should deny Lally's motion in its entirety.

## II.      FACTUAL BACKGROUND

### A.      Lally and Six Other Consumers Sued Valve; Judge Coughenour Compelled Those Plaintiffs to Arbitrate

In 2021, a video game developer and seven consumers, including Lally, brought this action against Valve asserting antitrust claims. At that time, the Superseded SSA had an arbitration provision. (ECF 66.) Valve moved to compel the consumer plaintiffs to arbitrate. Lally opposed the motion, arguing that the arbitration agreement was unconscionable, unenforceable, and "would

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 2
(No. 2:21-CV-00563-JNW)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

deny" him "the ability to seek and obtain the statutory relief available to [him]." (ECF 51 at 1-2, 15-16.)

On October 25, 2021, Judge Coughenour compelled arbitration as to Lally and the six other plaintiffs only, concluding that challenges to the enforceability of the arbitration agreement were for an arbitrator to decide. The Court stayed these claims pending arbitration. (ECF No. 66.)

**B.      Two Years Later, Lally's Counsel Brought a Mass Arbitration Against Valve That Included Lally's Demand**

In December 2023, Lally's counsel—Mason LLP ("Mason")—submitted a total of 14,922 substantially identical individual demands for arbitration against Valve with the AAA, of which 14,911 remain, including Lally's arbitration. (ECF 468 ¶6; Declaration of Blake Marks-Dias ("Marks-Dias Declaration") ¶¶7, 11, Exs. 1, 3.) Those demands asserted antitrust claims substantially identical to those asserted here. Mason informed the AAA that the claimants would argue that the arbitration agreement in the Superseded SSA was unenforceable. (Marks-Dias Declaration ¶13, Ex. 5.) Valve paid the $1,866,100 in non-refundable filing fees the AAA required. (ECF 468 ¶7; Marks-Dias Declaration ¶¶10, 12, Exs. 2, 4.) Before the AAA appointed merits arbitrators, Mason and Valve agreed to mediate. (ECF 468 ¶10, 12.)

**C.      An Arbitrator Ruled That Valve's Arbitration Provision Was Unenforceable**

Meanwhile, the AAA appointed merits arbitrators for 624 arbitrations brought by another firm pursuing mass arbitration, Bucher Law PLLC ("Bucher"). Four of those claimants successfully challenged the arbitration provision in the Superseded SSA as unconscionable and unenforceable. (Marks-Dias Declaration ¶14.) Those claimants then commenced a new consumer class action in this Court, *Elliott v. Valve Corp.*, No. 2:24-cv-01218.

**D.      Valve Removed the Arbitration Provision; All Consumer Plaintiffs Except Lally Moved to Lift the Stay**

On September 26, 2024, after the arbitrator's ruling that the arbitration provision in the Superseded SSA was unenforceable, Valve amended the SSA to remove it. The Current SSA now provides:

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 3
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

> You and Valve agree that all disputes and claims between you and Valve (including any dispute or claim that arose before the existence of this or any prior agreement) shall be commenced and maintained **exclusively in any state or federal court** located in King County, Washington, having subject matter jurisdiction.

(Marks-Dias Declaration, Ex. 6 § 10 (emphasis added).) The Current SSA includes a merger clause providing that it supersedes and replaces the parties' prior agreement. (*Id.* §11.)

Valve notified users of the amendment through direct email notice, an in-app "pop-up" notification, and on its website. (*Id.*, Ex. 8.) Users could check a box indicating that they accepted the amendment, but the notices also informed users they would accept the amendment if they continued using the Steam platform. (*Id.*) Users were also required to accept the Current SSA before making additional game purchases on Steam after September 26, 2024.

The next day, Valve notified this Court and the AAA that it had withdrawn the arbitration provision. (ECF 362.) Valve reimbursed Mason for the $1,518,325 in AAA filing fees it had paid—a fact Mr. Mason omits from his declaration. (Marks-Dias Declaration ¶19, Ex. 7.) All consumer plaintiffs except Lally moved to lift the stay. (ECF 370.) On December 10, 2024, the Court lifted the stay, except as to Lally. (ECF 395.)

On October 18, 2024, Valve petitioned this Court to enjoin the pending arbitrations of 624 claimants represented by Bucher on the ground that, under the Current SSA, there is no arbitration agreement between the parties. (Marks-Dias Declaration ¶21, Ex. 8 ("*Abbruzzese*").) *Abbruzzese* remains pending.

**E.      The AAA Invoiced Valve $20.8 Million for the 14,911 Arbitration Demands Brought by Lally's Counsel; Valve Declined to Pay Those Fees and the AAA Suspended the Arbitrations**

On February 5, 2025, after the parties' mediation ended unsuccessfully, Mason advised the AAA it wished to proceed with mass arbitrations. (Marks-Dias Declaration ¶25, Ex. 9.) Valve asked the AAA to close the arbitrations because the Current SSA had no arbitration provision. (*Id.* ¶26, Ex. 10.)

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 4
(No. 2:21-CV-00563-JNW)

The AAA rejected Valve's request to close the arbitrations and instead issued an invoice to Valve for $20,875,400 in arbitrator appointment fees ($1,400 per case) for the 14,911 arbitrations. Lally's single arbitration demand was part of this collective invoice. Valve elected not to pay that invoice because the Current SSA did not permit arbitration, and no arbitrator had jurisdiction to decide that the Superseded SSA should govern instead. On May 15, 2025, the AAA suspended the arbitrations because of Valve's refusal to pay. (ECF 468 ¶17.)

On May 2, 2025, another claimant represented by Mason brought a putative class action in California seeking to compel Valve to pay those arbitrator appointment fees (which duplicates the relief sought on this Motion). (Marks-Dias Declaration ¶30, Ex. 14.) Lally is a member of that putative class. (ECF 34 ¶29; Marks-Dias Declaration, Ex. 14 ¶50.) Valve is opposing that action.

**F.      Lally Apparently Quit Using Steam Before the SSA Was Amended and Did Not Agree to the Current SSA**

After receiving this Motion, Valve determined that Lally has not logged on to Steam since June 2023 and thus apparently did not agree to the Current SSA. (Marks-Dias Declaration ¶34, Ex. 16.) Out of the 14,911 claimants, Lally was the <u>only one</u> whom Judge Coughenour compelled to arbitrate. Valve informed Lally's counsel and the AAA that it was willing to arbitrate with Lally individually and requested that the AAA issue an invoice for that arbitration. (*Id.* ¶34-35, Exs. 16-17.)

Lally opposed Valve's request and asked the AAA not to issue an individual invoice, making it clear that the point of this Motion is not to pursue his own arbitration, but to force Valve to pay $20.8 million in fees for other claimants. (*Id.* ¶36, Ex. 18.) On June 25, 2025, the AAA informed the parties it would not issue the invoice. (*Id.* ¶37, Ex. 20.)

**III.     ARGUMENT**

**A.      Lally Is Entitled to No Relief Personally and Has No Standing to Seek Relief on Behalf of 14,910 Other People**

Lally seeks an order on behalf of himself and 14,910 other claimants, imposing a "deadline for Valve to pay" $20.8 million, with a threat of default and adverse inference sanctions for non-

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 5
(No. 2:21-CV-00563-JNW)

CORR CRONIN LLP
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

compliance, and attorneys' fees. (Mot. 11:17-23.) That relief is not a sanction, but an order compelling arbitration on behalf of 14,910 strangers. All but two of the cases Lally cites address motions to compel arbitration under § 4 or for other relief under the FAA, not sanctions, with several of them *denying* motions to compel.[2] In *Frazier v. X Corp.*, 739 F. Supp. 3d 219 (S.D.N.Y. 2024), for example, where no party disputed that an arbitration agreement existed, the court ordered the defendant to pay administrative fees pursuant to § 4 on an "interim" basis until an arbitrator could rule on fee allocation. Lally is not entitled to compel fee payment on behalf of himself or anyone else.

1. **Lally Is Not Entitled to Relief Because Valve Has Agreed to Arbitrate His Individual Claim**

The FAA provides that a "party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate" may petition a federal district court to compel arbitration. 9 U.S.C. § 4. A refusal to arbitrate is "a prerequisite to compelling arbitration under Section 4 of the FAA." *Jacobs v. USA Track & Field*, 374 F.3d 85, 86 (2d Cir. 2004). Where a party attempts to arbitrate, there is no "failure, neglect, or refusal" by which another party could have been "aggrieved." *Jones v. Starz Ent., LLC*, 129 F.4th 1176, 1181 (9th Cir. 2025).

Here, Valve is willing to arbitrate individually with Lally pursuant to the Superseded SSA and pay AAA fees. Lally's circumstances are unusual: he is one of only seven individuals who were compelled to arbitrate by this Court, and the only one of the seven who—despite having once maintained that the relevant arbitration provision was unenforceable—now seeks to enforce it. Moreover, because no one has logged into the Steam account he claims since June 2023, he has apparently not agreed to the Current SSA requiring disputes to be resolved in court.

---

[2] *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 676 (9th Cir. 2024) (denying motion to compel under § 4); *Tillman v. Tillman*, 825 F.3d 1069, 1075 (9th Cir. 2016) (plaintiff unable to pay arbitral fees could proceed in court); *Sink v. Aden Enters., Inc*, 352 F.3d 1197, 1199-1200 (9th Cir. 2023) (denying motion to compel under § 4); *Allemeier v. Zyppah, Inc.*, 2018 WL 6038340, at *4 (C.D. Cal. Sept. 21, 2018) (granting § 4 motion to compel); *Abernathy v. DoorDash, Inc.*, 438 F. Supp. 3d 1062, 1065-66 (N.D. Cal. 2020) (granting § 4 motion to compel).

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 6
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

Accordingly, Valve requested that the AAA issue an invoice for Lally's arbitration, which Valve would have paid had the AAA provided it. Valve has not refused to arbitrate with Lally, and he is entitled to no relief. That should be the end of the matter.

Lally argues that he has "Been Prejudiced by Valve's Delay Tactics" (Mot. 5) but identifies no such tactics, or any reason why any such tactics might justify the extraordinary relief he now seeks:

1) Lally asserts that he has been denied "access to any forum for redress for over three years," but he waited more than two years to bring his demand after Judge Coughenour directed him to arbitration. (Mot. 5:5, 21.) He also ignores that he—not Valve—chose to bring his arbitration as part of a "mass arbitration," which, as he acknowledges, caused administrative delays. (Mot. 5:5-12.)

2) Lally also complains that a mediation between the parties took some time, suggesting that "the availability of the preferred mediator and then the fires in California" were somehow part of "Valve's Delay Tactics." (Mot. 5:4-15.) Valve was not responsible for those circumstances.

3) Lally further suggests that Valve's promulgation of the Current SSA was itself a "Delay Tactic[]." (*Id.* at 5:15-18.) Valve removed the arbitration provision after an arbitrator ruled it unenforceable, not because doing so would impact Lally's arbitration.

**2.      Lally Has No Standing to Seek Relief on Behalf of 14,910 Other People**

In seeking to compel Valve to pay fees for 14,910 other arbitrations claimants, Lally is seeking relief on behalf of third parties for whom he has no standing to act. The arbitration provision in the Superseded SSA Lally invokes forecloses any "CLASS OR REPRESENTATIVE ACTION" and precludes Valve and Lally from "seek[ing] to combine an action . . . with any other action" without all parties' consent. (ECF 35 at 6-7, Boyd Decl., Ex. E.) That agreement forecloses Lally's attempt to seek collective relief here.

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 7
(No. 2:21-CV-00563-JNW)

Further, a party "generally must assert his own legal rights and interests, and cannot rest [a] claim to relief on the legal rights or interests of third parties." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). To seek relief on behalf of a third party, a person must have a "close relationship with the person who possesses the right" and there must be a "'hindrance' to the possessor's ability to protect his own interests." *Id.* at 130. Here, Lally appears to have no relationship, let alone a "close" one, with those 14,910 people who are not before the Court. Likewise, these other claimants are fully capable of protecting their own interests. One of them is already pursuing a putative class action in California seeking the same relief. (Marks-Dias Declaration ¶30, Ex. 14.) Lally is part of that putative class. (ECF 34 ¶29; Marks-Dias Declaration ¶30, Ex. 14 ¶50.)

**B.      The 14,910 Strangers to This Action Have No Right to Arbitrate**

Lally has also not shown that the 14,910 claimants who are not before the Court have any right to arbitrate:

First, Lally has not shown that these claimants are actually Valve's customers; his counsel's unverified statement that those claimants "are Steam subscribers" is insufficient. *See Wallrich v. Samsung Elecs. Am., Inc.*, 106 F.4th 609, 618-19 (7th Cir. 2024) (error to compel arbitration based on counsel's representations as to arbitration rights where no claimant "submitted any declaration or otherwise attested under penalty of perjury to the facts alleged in the arbitration demands."); *Abernathy*, 438 F. Supp. 3d at 1065 (refusing to compel arbitration for claimants who did not submit a sworn declaration attesting that they had an arbitration agreement). Nor is there any evidence that these other claimants are still bound by the Superseded SSA that contains an arbitration provision, as Lally appears to be.

Second, while the Court need not reach the question here,[3] Lally has not shown that the 14,910 claimants are not bound by the Current SSA, which has been in effect for nine months. Lally suggests that the Current SSA is unenforceable,[4] asserting that "[n]umerous courts, including

---

[3] The *Abbruzzese* Petition addresses this question.

[4] As Lally has not agreed to the Current SSA, he has no standing to challenge its enforceability.

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 8
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

arbitrators in other arbitration cases against Valve, have held that retroactive application of unilateral change to an arbitration agreement, as applicable to parties with pending arbitrations, is unconscionable and unenforceable." (Mot. 4.) Not so. Courts enforce modified agreements retroactively where there is notice and manifestation of assent. *E.g.*, *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1127 (11th Cir. 2014); *Pilon v. Discovery Commc'ns, LLC*, 769 F. Supp. 3d 273, 294-98 (S.D.N.Y. 2025); *Brooks v. WarnerMedia Direct, LLC*, 2024 WL 3330305, at *17 (S.D.N.Y. July 8, 2024); *McCumbee v. M Pizza, Inc.*, 2023 WL 2725991, at *10 (N.D. W. Va. Mar. 30, 2023); *In re Nat'l Football League's Sunday Ticket Antitrust Litig.*, 2021 WL 2350814, at *4 (C.D. Cal. Apr. 20, 2021); *Laster v. T-Mobile USA, Inc.*, 2008 WL 5216255, at *6 (S.D. Cal. Aug. 11, 2008); *Enderlin v. XM Satellite Radio Holdings, Inc.*, 2008 WL 830262, at *7 (E.D. Ark. Mar. 25, 2008); *Goetsch v. Shell Oil Co.*, 197 F.R.D. 574, 577 (W.D.N.C. 2000).

The one case Lally cites, *Heckman*, is distinguishable. That court did not conclude that Ticketmaster's arbitration agreement was "unconscionable and unenforceable" just because it applied retroactively. 120 F.4th at 682. It concluded the agreement was procedurally unconscionable because Ticketmaster could unilaterally modify it at any time without prior notice, apply it to previously-purchased tickets, and bind anyone simply visiting the Ticketmaster website—denying them an opportunity to avoid the new terms. *Id.* at 682-83. It was found to be substantively unconscionable because it incorporated rules that were one-sided and convoluted. *Id.* at 683-84. Here, Valve provided 30 days' notice of the Current SSA via multiple channels, and Steam users affirmatively agreed to the Current SSA through checking a box, making a purchase, or continuing to use Steam after receiving notice. (That Lally did none of those shows he is uniquely situated.)

The lone arbitral decision Lally cites was issued by an arbitrator whom the AAA has since disqualified (Valve informed Mason of that). (Marks-Dias Declaration ¶38.) The arbitrator replacing her rejected her analysis and temporarily stayed the arbitrations. (*Id.* ¶40.) Twenty other arbitrators have stayed arbitrations based on the *Abbruzzese* Petition. (*Id.* ¶41.) Arbitrators have

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 9
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

no jurisdiction to decide whether the Current SSA is enforceable. *See Coinbase, Inc. v. Suski*, 602 U.S. 143, 149 (2024).

### C.   Valve's Refusal to Pay $20.8 Million in Fees Did Not Violate Judge Coughenour's Order Compelling Arbitration

Lally argues that Valve "disobe[yed]" Judge Coughenour's order compelling arbitration by refusing to pay $20.8 million in AAA fees. (Mot. 11.) That is wrong. Valve's motion to compel Lally to arbitrate had nothing to do with the other 14,910 non-parties to whom Lally has tied himself.  Similarly, Judge Coughenour's order never compelled any of those people except Lally to arbitrate.

Lally had argued to Judge Coughenour that the arbitration provision in the Superseded SSA was unenforceable. (ECF 51 at 1-2, 15-16.) After he filed his arbitration demand, he told the AAA he intended to make that argument again in arbitration. (Marks-Dias Declaration ¶13, Ex. 5.) When the arbitration provision in the Superseded SSA was found unenforceable, and Valve removed that provision from the Current SSA, Lally seemed to have gotten what he wanted. But when he changed his mind and decided to push forward with the arbitration against which he previously fought, Valve agreed to pay the fees necessary for his individual arbitration to proceed. In short, Valve did everything Judge Coughenour's prior order required.

Beyond that, Lally cites no authority holding that a party's refusal to pay arbitration fees is sanctionable. The AAA rules contemplate that a party may refuse to pay fees. If the opposing party elects not to advance those fees, the AAA will suspend or close the arbitration. AAA Supplementary Rules MC-10(d), (e); *Wallrich*, 106 F.4th at 613 (summarizing AAA rules). The remedy for refusal to pay fees is not sanctions or an order to pay fees, but waiver of the right to arbitrate. *See Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1011-13 (9th Cir. 2004) (court lacked authority to compel arbitration and order a party to pay fees after the AAA suspended proceedings for failure to pay); *see also Wallrich*, 106 F.4th at 620 ("[T]he district court

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 10
(No. 2:21-CV-00563-JNW)

exceeded its authority and the scope of the arbitration agreement by ordering Samsung to pay the AAA filing fees.").

Only two of the cases Lally cites even mention sanctions at all, and neither helps him. In *Lopez v. Thermo Tech Mech. Inc.*, 2023 WL 5571312 (S.D.N.Y. Aug. 29, 2023), the court *denied* sanctions, concluding that a defendant's failure to pay fees that were "greater than the total liability in this case" was not "undertaken for purpose of delay." *Id.* at *3. And in *Serv. Emps. Int'l Union Local 32BJ v. Preeminent Protective Servs., Inc.*, 997 F.3d 1217 (D.C. Cir. 2021), the court did not consider the merits of an appeal from a contempt order based on refusal to arbitrate because the appeal was not timely. Neither supports imposing sanctions here.

**D.      Valve's Update to the Steam Subscriber Agreement Is Not Sanctionable**

Lally argues (Mot. 8) that Valve should be sanctioned for amending the SSA to remove the arbitration provision that ***Lally himself*** previously argued was unenforceable. (ECF 51 at 1-2, 15-16.) His amended complaint also alleged his class action was "superior to any other method for the fair and efficient adjudication of this legal dispute." (ECF 34 ¶314.) Lally cannot now be heard to contend that Valve acted in bad faith by withdrawing an arbitration provision that he and his counsel argued was unenforceable and giving Lally the federal-court rights he initially sought. Nor does Lally cite any authority where a court sanctioned a company for updating its user agreement.

**E.      Valve Has Not Violated Rule 11**

Lally asserts that two actions Valve brought against other law firms—one against Zaiger LLC and one against Bucher (who, incidentally, are also suing each other)—violated Rule 11. (Mot. 6-7.) He is not a party to either action and has no right to seek sanctions related to them. *See Christian v. Mattel, Inc.*, 286 F.3d 1118, 1131 (9th Cir. 2002) (no sanctions for conduct in other proceedings); *Westlake N. Prop. Owners Ass'n v. City of Thousand Oaks*, 915 F.2d 1301, 1307

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 11
(No. 2:21-CV-00563-JNW)

(9th Cir. 1990) (a non-party to a case cannot seek sanctions).[5] Nor did either suit violate Rule 11. Lally claims that the "obvious inference" is that Valve brought the suits to "dissuade other counsel and subscribers from pursuing their arbitration claims against Valve." (Mot 8.) If so, that effort failed: Mason, Zaiger, and Bucher are continuing to pursue "hundreds of thousands" of arbitrations against Valve. (*Id.*) Moreover, Zaiger and Bucher made that same contention to the courts hearing the suits, and neither court agreed. (Marks-Dias Declaration ¶¶42-45, Exs. 21 at 1; 22 at 15 n.3; 23 at 1; 24 at 1.)

Lally also suggests that the Petition to Enjoin Arbitrations that Valve filed in this Court against other arbitration claimants violated Rule 11. That petition, too, is a separate action to which neither Lally nor the 14,910 others are parties. That action is firmly grounded in law and fact and was filed for the proper purpose of resolving whether Valve must arbitrate with claimants who have agreed to withdrawal of the arbitration provision. (*Id.* ¶21, Ex. 8.) It does not violate Rule 11.

### F.     Valve Has Not Committed Criminal Contempt

Lally references 18 U.S.C. § 401, the criminal contempt statute (Mot. 10), which permits a court to "punish by fine or imprisonment, or both, at its discretion," "contempt of its authority." *Id.* Lally seeks neither a fine nor imprisonment against Valve, so § 401 is inapplicable on its face. Nor has Valve has committed any contempt of this Court's authority.

### IV.     CONCLUSION

The Court should deny the Motion in its entirety.

---

[5] Rule 11(c)(2) also places "stringent notice and filing requirements on parties seeking sanctions." *Holgate v. Baldwin*, 425 F.3d 671, 677 (9th Cir. 2005). Lally has not complied with those requirements.  Indeed, Lally did not even meet and confer with Valve before filing the Motion.

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 12
(No. 2:21-CV-00563-JNW)

**CORR CRONIN LLP**
1015 Second Avenue, Floor 10
Seattle, Washington 98104-1001
Tel (206) 625-8600
Fax (206) 625-0900

DATED: June 26, 2025.

I certify that this memorandum contains 4,185 words, in compliance with the Court's Order.

CORR CRONIN LLP

*s/ Blake Marks-Dias*
Blake Marks-Dias, WSBA No. 28169
1015 Second Avenue, Floor 10
Seattle, Washington 98104
(206) 625-8600 Phone
(206) 625-0900 Fax
bmarksdias@corrcronin.com

Michael W. McTigue Jr., *Admitted Pro Hac Vice*
Meredith C. Slawe, *Admitted Pro Hac Vice*
SKADDEN, ARPS, SLATE,
  MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
michael.mctigue@skadden.com
meredith.slawe@skadden.com

*Attorneys for Defendant Valve Corporation*

OPPOSITION TO PLAINTIFF RYAN LALLY'S
MOTION FOR SANCTIONS – 13
(No. 2:21-CV-00563-JNW)